**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CARY WALLACE WILLIAMS,
*Petitioner-Appellant*,

v.

TIMOTHY FILSON, Warden; ADAM
PAUL LAXALT, Attorney General,
*Respondents-Appellees.*

No. 13-99002

D.C. No.
2:98-cv-00056-
PMP-VCF

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

CARY WALLACE WILLIAMS,
*Petitioner-Appellant*,

v.

TIMOTHY FILSON, Warden; ADAM
PAUL LAXALT, Attorney General,
*Respondents-Appellees.*

No. 17-15768

D.C. No.
2:98-cv-00056-
APG-VCF

Appeal from the United States District Court
for the District of Nevada
Andrew P. Gordon, District Judge, Presiding

CARY WALLACE WILLIAMS,                    No. 17-71510
                              *Petitioner*,


              v.                          OPINION


TIMOTHY FILSON, Warden; ADAM
PAUL LAXALT, Attorney General of
the State of Nevada,
                           *Respondents.*

Application to File Second or Successive Petition
Under 28 U.S.C. § 2254

Argued and Submitted September 20, 2017
San Francisco, California

Filed November 9, 2018

Before:  Marsha S. Berzon, Paul J. Watford,
and John B. Owens, Circuit Judges.

Opinion by Judge Watford

# SUMMARY[*]

## Habeas Corpus / Death Penalty

The panel affirmed in part and reversed in part the district court's denial of Cary Williams' first federal habeas corpus petition challenging his Nevada murder conviction and death sentence, and remanded for an evidentiary hearing on one of Williams' penalty-phase ineffective assistance of counsel claims; affirmed the district court's denial of his motion for relief under Fed. R. Civ. P. 60(b); and denied Williams' application to file a second or successive federal habeas petition.

The panel held that Williams is entitled to equitable tolling between the date of the one-year AEDPA deadline for filing a federal habeas petition and the date he filed his amended federal petition, and that all of the claims asserted in the amended petition are therefore timely. Because Williams is entitled to equitable tolling even if the claims asserted in the original and amended opinions do not share a common core of operative facts, the panel did not need to decide whether the district court's application of the relation-back standard from *Mayle v. Felix*, 545 U.S. 644 (2005), is correct. The panel remanded for further proceedings as to the claims the district court dismissed based solely on the assumed untimeliness of the amended petition.

Applying AEDPA deference, the panel held that the district court did not abuse its discretion in denying an

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

evidentiary hearing on Williams' claim that his trial counsel failed to discover and present evidence that he suffers from brain damage. Reviewing *de novo*, the panel held that the district court did abuse its discretion in denying a hearing on Williams' claim that trial counsel unreasonably failed to investigate and present substantial mitigating evidence regarding his abusive and traumatic childhood.

The panel held that the district court did not err by denying Williams' request for an evidentiary hearing on his claims that trial counsel rendered ineffective assistance during the guilt phase by failing to prepare an adequate defense and during the penalty phase by failing to retain a medical expert who could rebut the state's evidence that the murder involved torture. The panel held that the district court properly held that it could not consider documentary evidence as to the merits of those claims because Williams did not submit that evidence to the state courts in the manner required under state law. The panel rejected Williams' separate argument that he is entitled to have the documentary evidence considered under the rule subsequently established in *Martinez v. Ryan*, 566 U.S. 1 (2012). The panel concluded that the evidence contained in the declarations at issue does not place these claims in a significantly different and stronger posture such that they must be deemed "new" claims not previously presented to state courts.

The panel held that Williams' constitutional challenges to Nevada's "avoid lawful arrest" aggravating circumstance, Nev. Rev. Stat. § 200.033(5) (1981), lacked merit, even reviewing the merits *de novo*. The panel rejected Williams' contention that the aggravated circumstance is facially invalid under the Eighth Amendment because it is too vague and because it fails to adequately narrow the class of death-

eligible defendants. The panel also rejected Williams' contention that, as applied to him, the aggravating circumstance violates the Ex Post Facto Clause and the Fourteenth Amendment's Due Process Clause because he lacked adequate notice at the time he committed the offense that § 200.033(5) could be applied to the facts of his crime.

The panel held that Nev. Rev. Stat. § 34.726, which imposes a general one-year deadline for the filing of petitions for post-conviction relief, is an independent and adequate state procedural bar to federal review. The panel therefore affirmed the district court's dismissal of several of Williams' claims as procedurally defaulted under that statute. Because all of the claims asserted in Williams' amended petition are timely under AEDPA, the panel reversed the district court's dismissal of five ineffective-assistance claims and remanded for the district court to determine in the first instance whether Williams' procedural default on those claims is excused under *Martinez*.

The panel assumed without deciding that Williams' motion under Rule 60(b) was not a disguised second or successive petition. The panel wrote that Williams is not entitled to relief because even if *Hurst v. Florida*, 136 S. Ct. 616 (2016), established the new rule Williams urges, that rule would not apply retroactively in cases on collateral review. The panel wrote that Williams is also not entitled to relief because his Rule 60(b) motion rests on the incorrect premise that the Nevada Supreme Court did not apply a beyond-a-reasonable-doubt standard when it reweighed whether aggravating factors outweighed a mitigating circumstance.

The panel denied Williams' application to file a second or successive petition based on *Hurst*.

## COUNSEL

Michael Pescetta (argued), Randolph M. Fiedler, and Albert Sieber, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Petitioner-Appellant.

Victor-Hugo Schulze II (argued), Senior Attorney General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Las Vegas, Nevada; for Respondents-Appellees.

## OPINION

WATFORD, Circuit Judge:

Cary Williams was sentenced to death for the murder of Katherine Carlson in 1983. This is the appeal from the district court's denial of his first federal petition for a writ of habeas corpus. In the main appeal, we address the three issues on which the district court granted a certificate of appealability, as well as two uncertified issues that Williams raised in his opening brief. We affirm in part, reverse in part, and remand for an evidentiary hearing on one of Williams' penalty-phase ineffective assistance of counsel claims.

Williams has also filed a separate appeal from the district court's denial of his motion for relief under Rule 60(b) of the Federal Rules of Civil Procedure. We affirm the denial of Williams' Rule 60(b) motion.

## I. Background

### A. Conviction and Sentence

Many of the basic facts surrounding the murder of Ms. Carlson are no longer subject to reasonable dispute. Williams pleaded guilty to her murder during the guilt phase of the trial, and during the penalty phase he took the stand and described in detail how he committed the offense.

Williams grew up in the Los Angeles area but moved to Reno, Nevada, in February 1982, when he was 18 years old, both to escape the violence prevalent in his inner-city neighborhood and to pursue his interest in becoming a professional boxer. He moved in with his boxing coach, who lived in a residential community called Horizon Hills. Williams held a job as a maintenance worker in Horizon Hills, a position he used to burglarize several homes in the community while the owners were away during the day.

In June 1982, Ms. Carlson and her husband were a young couple living in Horizon Hills a few houses down the street from where Williams lived. Ms. Carlson worked as a nurse, her husband as a firefighter. Ms. Carlson was eight months pregnant at the time, expecting the couple's first child.

On the night of June 27, 1982, Williams decided to burglarize the Carlsons' home. He thought they had left town on vacation, as the camper he had seen them packing earlier in the day was no longer parked outside their home. But Ms. Carlson was home alone, asleep in her bedroom.

When Williams broke into the Carlsons' home that night, he saw a woman's purse on the kitchen counter, which led

him to take a large butcher knife from a drawer in the kitchen. He then walked through the house, room to room, looking for things to steal. When he reached the master bedroom, he turned on the lights and startled Ms. Carlson. She recognized Williams and said, "Oh, my God, you're the kid from down the street." According to Williams, Ms. Carlson then lunged toward a bedside dresser, and a struggle between them ensued as he tried to prevent her from reaching into one of the drawers. Williams admitted stabbing Ms. Carlson to death during the course of that struggle with the butcher knife he had taken from the kitchen. An autopsy revealed that Ms. Carlson suffered 38 stab wounds in all, three of which were fatal. Her unborn child died due to lack of oxygen after Ms. Carlson's death.

After killing Ms. Carlson, Williams took money, jewelry, a camera, and a .22 caliber pistol from her home.

The next day, Williams fled to Los Angeles by bus. Within a week, police in Reno had obtained a warrant for Williams' arrest, tipped off by Williams' efforts to pawn some of the jewelry he stole from the Carlsons' home. Williams learned of the warrant, surrendered to authorities in Los Angeles, and was eventually extradited to Reno. When questioned by the police in Reno, Williams confessed to the burglary and to having murdered Ms. Carlson during the course of the burglary.

In August 1982, the State of Nevada charged Williams with one count of murder for the death of Ms. Carlson, one count of manslaughter for the death of her unborn child, and one count of burglary. The case received widespread publicity throughout Washoe County, where Reno is located. The State sought the death penalty.

Trial commenced in December 1982. On the first day of jury selection, Williams pleaded guilty to the burglary charge. A week later, after a jury had been empaneled and testimony had begun, Williams pleaded guilty to the murder and manslaughter charges as well. Under Nevada law at the time, Williams' guilty plea to capital murder meant that the penalty phase of his trial would be held before a three-judge sentencing panel rather than a jury. Williams' trial counsel believed she had a better chance of persuading judges rather than jurors to spare Williams' life, given the intense public hostility to Williams in Washoe County at the time.

The penalty-phase hearing took place over three days in January 1983. The State portrayed Williams as a depraved individual whose criminal conduct escalated from a series of home burglaries to "the most brutal, the most sadistic and most merciless murder ever in the history of Washoe County." The State also focused attention on Williams' victims, introducing a photograph of a visibly pregnant Ms. Carlson two weeks before she was killed. Mr. Carlson offered detailed and emotional testimony about discovering his wife's body after the murder. The State concluded by calling a forensic pathologist who testified that there was "no question this woman was tortured before she was murdered."

Williams' mitigation case centered on the testimony of friends and relatives who described his redeeming qualities, although several of the family members who testified seemed to be unaware of his guilty plea or the details of the crime. The maternal figures in Williams' life described him as a caring and dutiful child, and his younger sisters explained how he had always cared for them. In addition to this character evidence, Williams' trial counsel pointed to hardships in Williams' life, including the death of his mother,

his being bounced around different homes and schools, and his growing up in the dangerous environment of South-Central Los Angeles. Williams also testified, recounting his version of events and expressing remorse for what had happened.

At the conclusion of the hearing, the three-judge panel sentenced Williams to death. The panel found four statutory aggravating circumstances: (1) the murder was committed during the commission of a burglary; (2) the murder was committed during the course of a robbery with the use of a deadly weapon; (3) the murder was committed to avoid or prevent Williams' lawful arrest for the burglary; and (4) the murder involved torture and depravity of mind. The panel found one statutory mitigating circumstance: the fact that Williams was only 19 at the time of the offense. The panel concluded that the aggravating circumstances outweighed the mitigating circumstances and that death was the appropriate punishment.

B.  Direct Appeal and State Post-Conviction Review

This case has a lengthy history in state court, spanning almost 25 years. In addition to pursuing a direct appeal, Williams filed a total of six petitions seeking post-conviction relief in state court, the last of which the Nevada Supreme Court denied in 2007. We provide only a brief overview of those proceedings here.

Williams filed a direct appeal with the Nevada Supreme Court shortly after he was sentenced to death in 1983. While his direct appeal was pending, he filed his first state petition for post-conviction relief, in which he alleged that his trial counsel had rendered ineffective assistance in violation of the

Sixth Amendment. The Nevada Supreme Court held Williams' direct appeal in abeyance while he litigated his petition for post-conviction relief. The state trial court held an evidentiary hearing on Williams' ineffective assistance of counsel claim in 1984, but ultimately denied relief. Williams appealed that ruling to the Nevada Supreme Court. In 1987, the Nevada Supreme Court affirmed Williams' convictions and sentence on direct appeal, and affirmed the denial of his first petition for post-conviction relief. *Williams v. State*, 737 P.2d 508 (Nev. 1987).

A succession of five additional petitions for post-conviction relief followed. The Nevada Supreme Court affirmed the denial of Williams' second and third petitions in 1988, holding that the claims raised were either procedurally barred or barred by the law-of-the-case doctrine. In 1990, the Nevada Supreme Court affirmed the denial of Williams' fourth petition, again on procedural bar grounds. The state trial court held an evidentiary hearing on Williams' fifth petition in 1995, but found none of the claims meritorious. The Nevada Supreme Court upheld that ruling in 1997, again relying on law-of-the-case and successiveness bars.

In 2003, Williams filed his sixth and final state petition for post-conviction relief, which the Nevada Supreme Court denied in 2006 on the basis of state-law timeliness and successiveness bars. *See* Nev. Rev. Stat. §§ 34.726, 34.810(2). As to one of Williams' claims, however, the court held that good cause excused Williams' procedural defaults. Specifically, the court concluded that two of the four aggravating circumstances found by the sentencing panel—that the murder was committed during the commission of a burglary and during the course of a robbery—were rendered invalid under recently decided

Nevada Supreme Court authority, thus justifying Williams' late presentation of the claim. But the court held that Williams could not show prejudice because, even after striking the two invalid aggravators, the remaining aggravators outweighed the lone statutory mitigating circumstance beyond a reasonable doubt. In 2007, the Nevada Supreme Court denied Williams' request for en banc reconsideration of that ruling, with two justices dissenting.

C.  Federal Habeas Corpus Proceedings

In January 1998, Williams initiated this action by filing a *pro se* petition for a writ of habeas corpus in federal court. The district court accepted the petition for filing in April 1998, following a delay in Williams' payment of the filing fee. Although a lawyer helped Williams prepare his *pro se* petition, everyone understood that this petition would need to be amended after Williams had been appointed federal habeas counsel. Unlike most federal habeas petitioners, as a state prisoner facing a sentence of death, Williams was statutorily entitled to the appointment of counsel to represent him in his federal habeas proceedings. *See* 18 U.S.C. § 3599(a)(2) (formerly codified at 21 U.S.C. § 848(q)(4)(B)).

On April 17, 1998, the district court appointed counsel from the Federal Public Defender's Office to represent Williams. Shortly thereafter, the court issued the first in a series of scheduling orders governing discovery and the filing of an amended petition, pursuant to what practitioners in the District of Nevada refer to as the "George Memo."

The George Memo established standardized procedures for handling federal habeas corpus proceedings involving state prisoners sentenced to death. First promulgated in 1992

under the direction of then-Chief District Judge Lloyd George, the George Memo divides capital habeas proceedings into five discrete stages and provides sample orders that can be issued at each stage. For example, upon the filing of the initial petition, the George Memo calls for the district court to appoint counsel and schedule an initial status conference. At the initial conference, the district court sets a schedule affording federal habeas counsel adequate time (typically six months) to review the record and conduct all necessary discovery. At the same time, the court sets a deadline for the filing of an amended federal petition containing all claims that the petitioner seeks to litigate, both exhausted and unexhausted. Under the procedures outlined in the George Memo, the federal petition will be held in abeyance, if necessary, to allow the petitioner to complete the exhaustion process in state court. Once the petitioner fully exhausts all of the claims to be litigated, the federal habeas proceedings will then be reopened to allow resolution of the claims on the merits. The stated goal of these standardized procedures is to reduce the delay and inefficiency caused when federal habeas petitioners bounce back and forth between state and federal court as they attempt to exhaust available state remedies.

The district court in this case followed the standardized procedures spelled out in the George Memo. After appointing counsel in mid-April 1998, the court set the initial status conference for August 28, 1998. At the conclusion of that hearing, the court issued a scheduling order granting Williams' counsel six months to review the record and complete all discovery. The court set a deadline of May 14, 1999, for the filing of Williams' amended petition, although the parties recognized that the deadline might need to be extended depending on how long it took the parties to resolve any discovery-related issues.

As it turned out, discovery-related issues did arise, and at Williams' request the district court twice extended the deadline for filing the amended petition. The State did not oppose either extension. Williams filed his amended federal petition on September 17, 1999, within the deadline ultimately set by the court. He then filed a second amended petition in May 2002, within the deadline stipulated by the parties.

In May 2003, the district court granted Williams' request to hold his federal habeas proceedings in abeyance while he litigated his sixth and final petition for state post-conviction relief, the last step necessary to complete the exhaustion process. After the Nevada Supreme Court affirmed the denial of that petition in 2007, the district court granted Williams' request to reopen his federal habeas proceedings, as contemplated under the George Memo.

Williams filed a third amended federal habeas petition, the operative petition in this case, in October 2007. Williams raised 38 claims for relief and requested an evidentiary hearing. In a series of orders entered between 2009 and 2012, the district court denied Williams' request for an evidentiary hearing and eventually denied relief on all claims. The court held that some of the claims were barred by the federal statute of limitations, 28 U.S.C. § 2244(d), and that Williams was not entitled to equitable tolling of the federal filing deadline. The court concluded that many of Williams' remaining claims were procedurally defaulted because the Nevada Supreme Court had determined that they were barred by the statute of limitations set by state law, under Nevada Revised Statutes § 34.726. As to the handful of claims that survived, the district court denied relief on the merits.

The district court granted a certificate of appealability as to the issues we address below in sections II.A, II.C, and II.D. As noted above, Williams raised a number of uncertified issues in his opening brief, which under Ninth Circuit Rule 22.1(e), we treat as a request to expand the certificate of appealability. We asked the State to respond to several of the uncertified issues, and we now grant a certificate of appealability as to the issues addressed in sections II.B and II.E below.

## II. Discussion

### A. Equitable Tolling

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) sets a one-year statute of limitations for filing a federal petition for a writ of habeas corpus. 28 U.S.C. § 2244(d). It is undisputed in this case that the one-year deadline for Williams ran until August 29, 1998. Thus, his initial *pro se* federal petition, accepted for filing on April 15, 1998, was unquestionably timely. His amended petition, filed on September 17, 1999, raised a significant number of new claims not asserted in the original petition. That is not surprising, given that the amended petition was prepared by counsel with expertise in federal habeas proceedings after the district court had afforded them time to conduct discovery and review the voluminous record. The issue is whether the new claims asserted in the amended petition may be considered on the merits even though the petition containing them was filed after AEDPA's August 29, 1998, filing deadline.

The claims asserted in the September 1999 amended petition may be considered if they "relate back" to claims

asserted in the original petition filed in April 1998. That is because Federal Rule of Civil Procedure 15(c), which applies in federal habeas proceedings, provides in relevant part as follows:

**(c) Relation Back of Amendments.**

**(1)** *When an Amendment Relates Back.* An amendment to a pleading relates back to the date of the original pleading when:

\*          \*          \*

**(B)** the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]

Fed. R. Civ. P. 15(c)(1)(B).

The district court held that some of the claims asserted in Williams' amended petition do not relate back to the claims included in his original petition, thus rendering them untimely, even though all of the claims arise out of the same conviction and sentence. In so holding, the court applied the standard for relation back announced in *Mayle v. Felix*, 545 U.S. 644 (2005), a case decided more than five years after Williams filed his amended petition. In that case, the Supreme Court held that a claim asserted in an amended habeas petition relates back to the original petition only if "the original and amended petitions state claims that are tied to a common core of operative facts." *Id.* at 664. In so holding, the Court rejected the broader reading of Rule 15(c)

that our court had adopted. *See Felix v. Mayle*, 379 F.3d 612 (9th Cir. 2004), *rev'd*, 545 U.S. 644 (2005). We had viewed the relevant "transaction" or "occurrence" in federal habeas proceedings as the petitioner's trial and conviction, such that claims asserted in an amended petition would relate back so long as they arose out of the same trial and conviction challenged in the original petition. *See id.* at 615.

We need not decide whether the district court's application of the relation-back standard from the Supreme Court's decision in *Mayle* is correct. For we conclude that, even if the claims asserted in the original and amended petitions do not share a common core of operative facts, Williams is entitled to equitable tolling for the period between August 29, 1998, and September 17, 1999. All of the claims asserted in the September 1999 amended petition are therefore timely under AEDPA.

To be entitled to equitable tolling, a habeas petitioner must demonstrate two things: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland v. Florida*, 560 U.S. 631, 649 (2010) (internal quotation marks omitted). The State does not contest that Williams diligently pursued his rights between August 29, 1998, and September 17, 1999. Throughout that period, his counsel diligently reviewed the record, conducted discovery, and prepared an amended petition asserting all potential claims on Williams' behalf, both exhausted and unexhausted, as the district court's scheduling orders directed. *See* section I.C above. Williams' counsel filed the amended petition within the deadline set by the court after obtaining the court's approval of two extension requests, neither of which the State opposed. So the only issue here is whether Williams has

shown an extraordinary circumstance that prevented timely filing.

One way a petitioner can demonstrate an extraordinary circumstance is by showing that he relied on controlling circuit precedent to file what he thought would be a timely federal petition, only to see the circuit precedent subsequently overruled, thereby rendering his petition untimely. *See Nedds v. Calderon*, 678 F.3d 777, 781 (9th Cir. 2012); *Harris v. Carter*, 515 F.3d 1051, 1056–57 (9th Cir. 2008). We do not have quite that situation here. There was no controlling circuit precedent in the 1998–1999 time frame that interpreted the meaning of the terms "transaction" and "occurrence" in Rule 15(c) as applied to federal habeas proceedings. Our court did not address that issue until we decided *Felix v. Mayle* in 2004, years after Williams filed his amended petition. From August 1998 to September 1999, the law in our circuit remained unsettled on how broadly (or narrowly) Rule 15(c)'s relation-back standard should be construed to apply in federal habeas proceedings.

In *Harris*, we left open whether equitable tolling may be granted when a petitioner relies on the unsettled state of the law (rather than on controlling circuit precedent) in deciding when to file his petition. 515 F.3d at 1057 n.8; *see also Waldron-Ramsey v. Pacholke*, 556 F.3d 1008, 1013 (9th Cir. 2009) (same). But the Tenth Circuit has squarely addressed that question, in a decision whose reasoning we find persuasive here.

In *York v. Galetka*, 314 F.3d 522 (10th Cir. 2003), the court confronted a set of circumstances similar to those present in this case. The petitioner in *York* relied on the unsettled state of the law regarding whether AEDPA's one-

year filing deadline would be tolled during the period in which an earlier federal habeas petition remained pending. York filed his third federal habeas petition on the assumption that such tolling would be available. His third petition was timely with that period of tolling taken into account but untimely without it. When York filed his third petition in March 2000, the Tenth Circuit had not yet resolved the issue. It did so roughly a year later, when it held in *Petrick v. Martin*, 236 F.3d 624 (10th Cir. 2001), that AEDPA's tolling provision authorized statutory tolling for both state and federal petitions during the period in which they remained pending. Shortly thereafter, however, the Supreme Court held in *Duncan v. Walker*, 533 U.S. 167 (2001), that the tolling provision applied only to pending state petitions, thereby rendering York's third petition untimely.

The Tenth Circuit concluded that in these circumstances York was entitled to equitable tolling. The court acknowledged that York could not have relied on controlling circuit precedent in deciding when to file his third petition, since the favorable ruling in *Petrick* had not yet been issued. *York*, 314 F.3d at 528. The court held that equitable tolling was nonetheless appropriate because "the law in this circuit was unsettled on the issue"; the statute in question was ambiguous as to the availability of tolling for pending federal petitions; and the Supreme Court did not resolve that ambiguity adversely to York until after he had filed his third petition. *Id.*; *see also Griffin v. Rogers*, 399 F.3d 626, 637 (6th Cir. 2005) ("unstable and unsettled" state of the law supported equitable tolling).

The facts in Williams' case are similar to those in *York*, although, as we shall explain, the circumstances here favoring equitable tolling go beyond those present in *York*. Williams

relied on the unsettled state of the law when he assumed that the claims asserted in his amended petition would relate back to the claims asserted in his original April 1998 petition. Rule 15(c) was undoubtedly ambiguous on this point: As applied to federal habeas proceedings, the terms "transaction" and "occurrence" could readily be understood to mean the petitioner's trial and conviction, as evidenced by the fact that two circuits (ours and the Seventh) later interpreted the terms in that way, as did the two dissenting Justices in *Mayle*. *See Mayle*, 545 U.S. at 670–74 (Souter, J., dissenting, joined by Stevens, J.); *Felix*, 379 F.3d at 615; *Ellzey v. United States*, 324 F.3d 521, 525–26 (7th Cir. 2003). The Supreme Court did not resolve the ambiguity in how Rule 15(c) should be interpreted until after Williams had filed his amended petition, at which point it was too late for him to cure any timeliness issues that arose as a result.

To be entitled to equitable tolling, Williams' reliance on the unsettled state of the law must have been reasonable during the time period in question. *Cf. Lawrence v. Florida*, 549 U.S. 327, 336 (2007) (petitioner was not entitled to equitable tolling where every circuit to address an issue, including petitioner's home circuit, had resolved the issue adversely to him). We think Williams' reliance was eminently reasonable, for at least two reasons.

First, in surveying the law as it stood at the end of August 1998, when AEDPA's one-year filing deadline passed, Williams' counsel had no reason to suspect that Rule 15(c) would pose an obstacle to consideration of newly added claims in an amended petition. Ninth Circuit law interpreting Rule 15(c) in the context of ordinary civil actions had construed the relation-back standard broadly, permitting relation back of newly added claims arising out of the same

transaction or occurrence even if "the new claims are based on a different legal theory of which there was no warning in the original pleading." *Felix*, 379 F.3d at 615. Because Rule 15(c)'s reference to "transaction" or "occurrence" could plausibly be read in the federal habeas context to refer to the petitioner's conviction and trial, habeas practitioners reasonably assumed that newly added claims would relate back to the original petition so long as the claims arose out of the same trial and conviction challenged in the original petition. No circuit court in the country had interpreted Rule 15(c) to the contrary as of August 1998; the first decision imposing a more restrictive reading of Rule 15(c) did not come until February 1999. *See United States v. Craycraft*, 167 F.3d 451, 456–57 (8th Cir. 1999). The dearth of precedent may explain why the leading habeas treatise at the time offered no discussion at all about Rule 15(c)'s relation-back standard, either in its section discussing AEDPA's recently added statute of limitations or in the section discussing amendment of the petition. *See* 1 James S. Liebman & Randy Hertz, Federal Habeas Corpus Practice and Procedure §§ 5.1b, 17.2 (3d ed. 1998).

Second, Williams' lawyers were not alone in assuming that newly added claims in an amended petition would relate back to the original petition; the district court shared that assumption. Indeed, the series of scheduling orders entered by the court is otherwise hard to explain. When the court appointed counsel for Williams in April 1998, only four-and-a-half months remained before AEDPA's one-year limitations period expired. But the court did not schedule the first status conference until August 28, 1998, literally the day before the one-year deadline passed, at which point Williams' lawyers were still digesting the 47 boxes of materials they had gathered and, in addition, attempting to formulate a discovery

plan to obtain the remaining materials they needed to review. The court granted counsel six additional months, as contemplated under the George Memo, to complete their review of the record and to conduct needed discovery. The court set an initial May 1999 deadline—well beyond the expiration of AEDPA's one-year statute of limitations—for the filing of a comprehensive amended petition asserting all potential claims, both exhausted and unexhausted. Setting that schedule made little sense if counsel would then be precluded from adding new claims unless the claims happened to share a common core of operative facts with claims Williams had asserted in his original *pro se* petition.

The State also assumed that any newly added claims would relate back. Only that understanding explains why the State waited *eight years* after receiving the amended petition before moving to dismiss any of the claims on the ground that they did not relate back to the original petition under Rule 15(c).

In sum, it was not until the Supreme Court decided *Mayle* in 2005 that anyone involved in this case suggested that the newly added claims might not relate back and could therefore be deemed untimely. Until then, the George Memo was followed, and it assumed that allowing amendment to add new claims was a valid way of efficiently structuring habeas proceedings in capital cases.

We hold that Williams is entitled to equitable tolling for the period from August 29, 1998, to September 17, 1999, and accordingly reverse the district court's contrary ruling. Ultimately, the district court dismissed just a handful of Williams' claims based solely on the assumed untimeliness of his September 1999 amended petition: Claims 1(C), 1(D),

1(E), 1(H), 1(I), 1(J), 9, and 14. We remand for further proceedings as to each of those claims.[1]

B. Claims 1(A) and 1(F)

We turn now to two related claims alleging ineffective assistance by Williams' trial counsel, Shelly O'Neill. In Claim 1(A), Williams alleges that O'Neill unreasonably failed to discover and present evidence that Williams suffers from brain damage. In Claim 1(F), Williams alleges that O'Neill unreasonably failed to investigate and present substantial mitigating evidence regarding his abusive and traumatic childhood. Williams argues that this evidence might have dissuaded the three-judge panel from sentencing him to death, and that the district court erred in denying him relief on these claims without granting his request for an evidentiary hearing.

Although these claims are substantively related, they come before us with different procedural backgrounds. Our analysis is informed by the standard of review applicable to each. We conclude that the district court did not abuse its discretion in denying an evidentiary hearing as to Claim 1(A). Although we conclude that O'Neill was deficient in failing to uncover evidence of Williams' brain damage, we defer to the Nevada Supreme Court's conclusion that this evidence on its own does not create a reasonable probability that the outcome of Williams' sentencing hearing would have been different.

---

[1] As explained in section II.E below, Claims 1(D), 1(E), 1(H), 1(I), and 1(J) were procedurally defaulted under state law. Thus, the district court's first order of business as to these claims, which allege ineffective assistance of trial counsel, will be to determine whether the default is excused under the rule established in *Martinez v. Ryan*, 566 U.S. 1 (2012).

As to Claim 1(F), however, we agree with Williams that the district court abused its discretion in denying an evidentiary hearing. We remand for the district court to hold an evidentiary hearing so that it may properly assess whether the evidence of Williams' childhood abuse and trauma—in combination with the brain damage evidence that was not on its own sufficient—gives rise to a reasonable probability that the outcome of Williams' sentencing hearing would have been different.

      1.  Claim 1(A)

Williams presented the substance of Claim 1(A) in his sixth and final state petition for post-conviction relief in 2003. The claim was substantiated by expert reports prepared in 1999 by Dr. David Schmidt, a clinical neuropsychologist, and Dr. Dennis DePry, a psychiatrist. Dr. Schmidt diagnosed Williams with neuropsychological impairment, traumatic brain injury, and polysubstance abuse. He reported that Williams' brain damage likely hampered his "ability to anticipate the long term consequences of his actions" and made him "more likely to act-out in a criminal manner." Dr. DePry concurred in these diagnoses, and added that Williams suffered from mixed personality disorder with dependent and schizoid traits.

The Nevada Supreme Court held that Williams had procedurally defaulted this claim, citing state-law timeliness and successiveness bars. *See* Nev. Rev. Stat. §§ 34.726, 34.810(2). Although it rejected the claim on procedural grounds, the court's order denying Williams' request for en banc reconsideration arguably reached the merits, as it addressed the ineffective assistance issue in considering whether Williams failed to show cause and prejudice

sufficient to overcome the procedural bars. With respect to prejudice at the guilt phase, the court reasoned that the doctors' reports "did not suggest that Williams was incompetent, insane, or lacked the capacity to understand his actions." With respect to the penalty phase, the court was "not persuaded that even assuming trial counsel had discovered and presented the brain damage evidence . . . in mitigation that it had a reasonable probability of altering the outcome of the penalty hearing."[2]

The State argues that the Nevada Supreme Court's decision constitutes an adjudication on the merits of Claim 1(A) and thus warrants AEDPA deference under 28 U.S.C. § 2254(d). The State contends that the court "accepted as true Williams' proffered reports" and engaged in the analysis required under *Strickland v. Washington*, 466 U.S. 668 (1984). The district court agreed, concluding that, "[e]ven though the court was considering the claim as part of its procedural default analysis, the ruling constitutes an adjudication on the merits for the purposes of § 2254(d)."

Although we have doubts about whether the Nevada Supreme Court reached the merits of Williams' claim, we recognize that the court did apply the functional equivalent of *Strickland*'s prejudice standard in conducting its cause-and-prejudice analysis. *See Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam) (explaining that AEDPA deference may be due even when the state court did not cite the federal standard).

---

[2] Two justices dissented from the denial of Williams' en banc request. They would have remanded to the state trial court for a "full evidentiary hearing concerning the extent of any actual physical brain damage and its impact on Williams's eligibility for the death penalty," particularly because two of the four aggravating factors had been stricken.

Because Williams does not dispute that the Nevada Supreme Court's decision amounted to a merits determination, we join the parties in assuming that the Nevada Supreme Court reached the merits of the *Strickland* issue and that the limitations of § 2254(d) therefore apply. Accepting those limitations, we cannot conclude that the district court abused its discretion in denying an evidentiary hearing on Claim 1(A).

Under § 2254(d), our review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). And we must defer to the state court's rejection of Claim 1(A) unless it "was contrary to, or involved an unreasonable application of, clearly established Federal law," or "was based on an unreasonable determination of the facts in light of the evidence presented" in state court. 28 U.S.C. § 2254(d). *Strickland* supplies the clearly established federal law for ineffective assistance of counsel claims. Under *Strickland*, Williams must demonstrate that his counsel's performance was constitutionally deficient and that the deficient performance prejudiced him. 466 U.S. at 687. To establish deficient performance, Williams must show that his counsel's performance "fell below an objective standard of reasonableness." *Id.* at 688. To establish prejudice, Williams must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

We may grant Williams habeas relief only if we find that the Nevada Supreme Court's application of *Strickland* was "objectively unreasonable." *Woods v. Sinclair*, 764 F.3d 1109, 1132 (9th Cir. 2014). In making this determination, we bear in mind that the "standards created by *Strickland* and

§ 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (internal quotation marks and citations omitted). We note, however, that while the Nevada Supreme Court effectively applied *Strickland*'s prejudice standard, it made no determination as to whether O'Neill's failure to have Williams examined by a competent neuropsychologist amounts to deficient performance. We therefore review this element of Williams' claim *de novo*. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam).

As to the guilt phase of the trial, the Nevada Supreme Court's denial of relief was not objectively unreasonable. Even assuming that O'Neill's performance was deficient, the Nevada Supreme Court's determination that Williams was not prejudiced as a result is entitled to deference. The evidence demonstrating Williams' guilt was substantial, and it was not unreasonable for the state court to conclude that the evidence contained in the doctors' reports would have been insufficient to support a credible insanity defense or to prove that Williams' guilty plea was invalid. *See Bemore v. Chappell*, 788 F.3d 1151, 1169–70 (9th Cir. 2015).

The question is much closer with respect to the penalty phase. "At the penalty phase, counsel's duty to follow up on indicia of mental impairment is quite different from—and much broader and less contingent than—the more confined guilt-phase responsibility." *Id*. at 1171. Trial counsel must therefore inquire into any mental impairments her client may have and "consult with appropriate medical experts." *Id.* (internal quotation marks omitted).

O'Neill's failure to make adequate inquiry in this case cannot be excused, given our insistence "that all relevant

mitigating information be unearthed for consideration at the capital sentencing phase" and that counsel "pursue relevant leads." *Id*. (internal quotation marks omitted). Competent counsel would have obtained records containing conspicuous red flags indicating that evaluation by a competent medical or mental health professional was warranted. Most prominently, Williams' juvenile court records indicate that in 1977 his probation officer "requested psychological testing in connection with assessment of possible organicity or brain damage." That testing revealed that there was "definitely some type of perceptual-motor inability or restrictiveness." In addition, Williams' juvenile and medical records document his consistent substance abuse during critical years for brain development. They reveal that he began sniffing glue as early as age 14, became increasingly dependent on alcohol during adolescence, and experimented with PCP. A fulsome investigation would also have revealed that Williams suffered multiple head injuries, including one from a car collision that left him unconscious for a period of 15 minutes and for which he never received medical treatment. Reviewing this aspect of the claim *de novo*, we conclude that O'Neill's failure to have Williams evaluated by a competent medical or mental health professional constituted deficient performance. *See Caro v. Woodford*, 280 F.3d 1247, 1254–56 (9th Cir. 2002); *Hendricks v. Calderon*, 70 F.3d 1032, 1043 (9th Cir. 1995).

The Nevada Supreme Court determined that Williams was not prejudiced by O'Neill's deficient performance. Our review of that determination is limited by the restrictions of § 2254(d), and we conclude that the state court did not unreasonably apply *Strickland*'s prejudice standard. The doctors' reports suggest that, relative to the brain-damaged population, Williams' impairment was not particularly severe: His score on a battery of tests placed his overall

neuropsychological functioning in the "mildly impaired range" as compared to the general population. Weighed against Williams' crime, it was not unreasonable for the Nevada Supreme Court to conclude that this evidence did not, on its own, give rise to a reasonable probability that the outcome of the sentencing hearing would have been different.

### 2. Claim 1(F)

We turn now to Claim 1(F), Williams' ineffective assistance of counsel claim predicated on O'Neill's failure to investigate and present compelling mitigating evidence regarding Williams' childhood. Williams presented the substance of this claim in his amended 1993 state petition for post-conviction relief. In support of the claim, he submitted 15 declarations from relatives and friends attesting to a childhood rife with neglect and abuse. After holding an evidentiary hearing, the state trial court denied relief in 1996, reasoning that it was "bound by the doctrine of the law of the case" because the Nevada Supreme Court had already considered and denied Williams' ineffective assistance claims in 1987. *See Williams*, 737 P.2d at 510. For good measure, the court also explained that O'Neill had in fact "investigated Mr. Williams' difficult childhood and his youth," and that the claim "would be dismissed on those grounds as well." In 1997, the Nevada Supreme Court affirmed only on the first ground, concluding "that the lower court properly dismissed Williams' petition based upon the doctrine of the law of the case."

The Nevada Supreme Court's reliance on the law-of-the-case doctrine amounted to a finding that Williams had procedurally defaulted Claim 1(F) by violating the state-law bar on successive petitions. *See* Nev. Rev. Stat. § 34.810(2).

However, the State has conceded that at the time it was invoked, Nevada's successiveness bar was not consistently applied and is therefore not an adequate state ground to preclude federal review. Accordingly, the State concedes that federal review of Claim 1(F) is *de novo*.

The question before us is whether the district court abused its discretion in denying relief on the claim without granting Williams' request for an evidentiary hearing. Williams is entitled to an evidentiary hearing if he can (1) "show that he has not failed to develop the factual basis of the claim in the state courts"; (2) meet one of the factors identified by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293 (1963), *overruled on other grounds by Kenney v. Tamayo-Reyes*, 504 U.S. 1 (1992); and (3) "make colorable allegations that, if proved at an evidentiary hearing, would entitle him to habeas relief." *Insyxiengmay v. Morgan*, 403 F.3d 657, 670 (9th Cir. 2005).

The first condition is easily met. Williams presented the evidence underlying Claim 1(F) in his 1993 state petition and at the state evidentiary hearing in 1995. Because he did not fail to develop the factual basis of the claim in state court, 28 U.S.C. § 2254(e)(2) poses no bar to a federal evidentiary hearing.

As to the second condition, Williams must show at least one of the following:

> (1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not

adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears that the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313. At least one factor applies here: The merits of the factual dispute were not resolved in state court (*Townsend* factor 1) because the claim was rejected by the Nevada Supreme Court on procedural grounds. And to the extent the state trial court considered the merits of the claim, that court's determination was not "fairly supported by the record as a whole" (*Townsend* factor 2). The state trial court held that the claim was "directly contradicted" by the fact that O'Neill "spoke to numerous members of Mr. Williams' family and friends" and had "investigated Mr. Williams' difficult childhood and his youth." But the court made no reference to the content of the 15 declarations, which, as discussed below, differs greatly from what O'Neill elicited in her investigation.

Having satisfied the first two conditions, Williams is entitled to an evidentiary hearing as long as he advances "colorable allegations that, if proved at an evidentiary hearing, would entitle him to habeas relief." *Insyxiengmay*, 403 F.3d at 670; *see also Quezada v. Scribner*, 611 F.3d 1165, 1166–67 (9th Cir. 2010) (order). The Supreme Court has held that a failure to investigate and present mitigating evidence of childhood abuse and trauma may constitute ineffective assistance of counsel. *Sears v. Upton*, 561 U.S. 945, 948, 956 (2010) (per curiam); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). To determine whether that is the

case here, we turn again to *Strickland*. Reviewing the matter *de novo*, we conclude that Williams has alleged a colorable claim that O'Neill rendered deficient performance and that Williams suffered prejudice as a result.

### a.    Deficient Performance

We begin with *Strickland*'s deficient performance prong. It is instructive to consult "[r]estatements of professional standards" that "describe the professional norms prevailing when the representation took place." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam). The ABA Standards for Criminal Justice applicable at the time of Williams' trial explained that defense counsel has "a substantial and important role to perform in raising mitigating factors," and that "[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant." ABA Standards for Criminal Justice 4-4.1, p. 4-55 (2d ed. 1980). We have explained that "the investigation should include inquiries into social background and evidence of family abuse." *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005) (en banc). Counsel's obligation "to cast a wide net for all relevant mitigating evidence" is at its height during the penalty phase of a capital case. *Frierson v. Woodford*, 463 F.3d 982, 989 (9th Cir. 2006). Assessed against these standards, Williams has alleged a colorable claim that O'Neill's failure to uncover evidence of Williams' childhood abuse and trauma constitutes deficient performance.

"[T]he presence of certain elements in a capital defendant's background, such as a family history of alcoholism, abuse, and emotional problems, triggers a duty to conduct further inquiry before choosing to cease

investigating." *Earp v. Ornoski*, 431 F.3d 1158, 1175–76 (9th Cir. 2005) (citing *Wiggins*, 539 U.S. at 525). O'Neill failed to take even the first steps of an adequate investigation, which in this case would have revealed warning signs regarding each of those elements in Williams' background. She failed to obtain Williams' juvenile records, which would have revealed that Williams' behavioral issues arose after his mother died when he was nine. She failed to obtain his medical records, which would have revealed that Williams dealt with the "emotional turmoil" in his life by resorting to drug use that negatively affected his "mental stability." And she failed to obtain Williams' school records, which would have revealed that his performance deteriorated throughout adolescence.

As discussed at length below, the declarations submitted in support of Claim 1(F) confirm that each of the red flags identified in *Earp* was present in Williams' background, and were in fact such prominent features of his childhood that anything beyond a cursory investigation would have uncovered them. And indeed, the declarations indicate that the little investigation O'Neill did do was, in fact, cursory at best.

O'Neill's investigation consisted of one three-day trip to Los Angeles, during which she met with a number of Williams' relatives and, according to one account, "talked to each person for ten to fifteen minutes." Williams' sister April reported that "I had barely begun to tell her [about] my brother, when it was all over." Williams' sister Cynthia reported that O'Neill asked her only "a little bit about how we grew up." Had O'Neill engaged more deeply, April and Cynthia could have described in detail the abuse that they and Williams endured throughout their childhoods. It is no

excuse that they and other family members were not immediately more forthcoming in their brief interviews with O'Neill. "Trial counsel has an affirmative duty not to simply accept the facts as they might be presented at first blush, but rather to 'unearth[] for consideration' at the sentencing phase 'all relevant mitigation information.'" *Doe v. Ayers*, 782 F.3d 425, 437 (9th Cir. 2015) (quoting *Wallace v. Stewart*, 184 F.3d 1112, 1117 (9th Cir. 1999)).

O'Neill failed not only to elicit relevant information, but also to prepare the family members and friends who testified at the sentencing hearing. Williams' sister April explained that O'Neill did not even mention when they met in Los Angeles that she would be asked to testify at the sentencing hearing, much less go over the kinds of questions she would be asked. This lack of preparation is apparent in the transcript of Williams' sentencing hearing, which is replete with indications that O'Neill failed to inform her most important witnesses of the questions she planned to ask them. Williams' sister Cynthia, for instance, insisted on the stand that Williams had not committed the murder, despite his guilty plea. When asked if Williams should be allowed to live even if he had committed the murder, Cynthia replied: "No. If he did it, no, he shouldn't." Williams' aunt, Inez Kelly, another critical witness, also insisted on Williams' innocence, and revealed that she had never been informed of the salient details of the crime. We have made clear that "the failure to prepare a witness adequately can render a penalty phase presentation deficient." *Hamilton v. Ayers*, 583 F.3d 1100, 1121 (9th Cir. 2009).

Having lapsed in her investigatory and preparatory duties, O'Neill was left to base her mitigation case primarily on Williams' redeeming qualities. The district court concluded

that "O'Neill arrived at this strategy after conducting a reasonable investigation into Williams's family and social background." We cannot agree. While it is "strongly presumed" that counsel "made all significant decisions in the exercise of reasonable professional judgment," *Strickland*, 466 U.S. at 690, we cannot credit O'Neill's decision to present the mitigation case she did as a strategic choice because "counsel cannot be said to have made a tactical decision without first procuring the information necessary to make such a decision." *Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006); s*ee also Correll v. Ryan*, 539 F.3d 938, 949 (9th Cir. 2008) ("An uninformed strategy is not a reasoned strategy. It is, in fact, no strategy at all.").

Moreover, no competent counsel would have made an informed choice to present the "good guy" mitigation case that O'Neill presented, when far more compelling mitigating evidence (discussed in the next section) was available. The judges on the sentencing panel heard that Williams "loved church" and was "always helping people." They heard that he made sure his younger sisters had lunch money for school, and that he helped out in his great-uncle's shop. This defense was obviously insufficient to mitigate what the prosecutor called "the most brutal, the most sadistic and most merciless murder ever in the history of Washoe County." *See Bemore*, 788 F.3d at 1172 ("[A] good character defense was unlikely to be persuasive to a jury that had just decided that [defendant] had carried out a grizzly murder, including torturing the victim . . . ."). O'Neill herself even told the judges that "[n]early everyone I talk to wants Cary Williams to die," and that "if [she] thought that killing Cary Williams would bring Katherine Carlson and her baby back," she felt "that would be a fair exchange." In his closing argument at sentencing, the prosecutor summed up O'Neill's presentation:

"So where, then, are the mitigating factors?  They simply do not exist in this case."

### b.  Prejudice

We turn now to *Strickland*'s prejudice prong.  To establish prejudice, Williams must show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  Comparing the mitigation case that O'Neill presented to the case that an adequate investigation would have yielded, we conclude that Williams has alleged a colorable claim that he was prejudiced by O'Neill's deficient performance.

O'Neill's mitigation case portrayed Williams as a thoughtful and dutiful child who grew up with the support of a loving family, despite being "bounced around a little bit" between homes and schools.  In light of Williams' proffered evidence, we now know that an adequate investigation would have revealed an upbringing marred by violence and upheaval, and a family life rife with abuse and neglect.

The declarations of friends and relatives reveal a life plagued by violence at home beginning when Williams was five years old.  It was then that his mother married Tommy Enge, who frequently beat her in front of the children—once so badly that she miscarried.  When Williams stepped in to try to protect his mother, the violence was directed at him. Williams' sister remembers one occasion on which Mr. Enge beat an eight-year-old Williams "like he was hitting a man." Williams and his mother and sisters endured constant abuse for nearly three years, until Williams' mother separated from Mr. Enge.

But any respite was short-lived. The following year, Williams' mother became bedridden with cancer. Williams acted as her caretaker and agonized over her daily deterioration until she died, when Williams was nine. The sentencing judges heard that Williams "missed" his mother, but not that he was so distraught at her funeral that he nearly dragged her casket off its platform, or that his teachers began to recognize behavioral problems around this time.

Following their mother's death, Williams and his sisters were passed between relatives who fought over the Social Security benefits that followed them. The sentencing judges heard that Williams was "shuffl[ed] from one caring relative to another," each of whom "loved him very much." They did not hear that Williams experienced constant abuse and neglect in each household.

Williams and his sisters first moved in with their mother's cousin, Inez Kelly. Ms. Kelly largely confined the children to the house and hoarded food so that they did not have enough to eat. Williams was forced to assume adult responsibilities, acting as a parent to his younger sisters and learning to drive at age nine so that he could take over the wheel when Ms. Kelly became too drunk to drive. When the children failed to live up to Ms. Kelly's exacting standards, she would punish them by locking them in a dark closet for hours or, more often, whip them with an extension cord with frayed wires at the end. These beatings left the children bruised and bloody. One whipping sent Williams' sister to the emergency room, but Williams consistently got the worst of it. Ms. Kelly's husband, Roosevelt Kelly, also frequently beat Williams. On one occasion, Mr. Kelly "had [12-year-old Williams] down on the ground and was whipping him as hard as he could, like he was hitting a punching bag." Mr. Kelly

also battered Ms. Kelly and sexually abused Williams' sisters, which Williams was helpless to prevent. Unable to endure this abuse, Williams ran away at age 13.

Williams then lived for a brief time with his aunt Jean Williams. The sentencing judges were told that Williams "didn't get along with" Aunt Jean's husband, Lawrence Enge (Tommy Enge's younger brother). They were not told that Williams' problem with Mr. Enge was his frequent abuse of Williams' aunt, grandmother, and sister, or that Mr. Enge was later convicted of child abuse.

Williams and his sisters next moved in with their aunt Katheryn Carter and her husband Larry Joe Carter. Neglected and again denied food, the only attention the children received in this house was unwanted. The Carters beat Williams and his sisters for a range of small infractions. And Williams was again left helpless to prevent the sexual abuse of his sisters, this time at the hands of Mr. Carter, who also allegedly raped and impregnated his own daughter. Williams and his sisters eventually returned to live with Aunt Jean and Lawrence Enge, who continued to sexually abuse one of Williams' sisters. In the midst of this rampant sexual abuse, Ms. Kelly had two of Williams' sisters fitted with intrauterine devices without their knowledge, which have left them able to give birth only through caesarean section.

As Williams entered his teenage years, this family turmoil was increasingly matched by violence outside the home. O'Neill told the sentencing judges that Williams grew up in a "rough neighborhood" where "white people would fear to go," but she failed to convey the level of violence he experienced. Between ages 14 and 16, Williams witnessed the shooting deaths of at least three of his friends. At age 16

or 17, he was surrounded by teenagers who placed a sawed-off shotgun in his mouth, only to be saved by a passing police car. He returned home from that incident to find his family already mourning his death. Williams estimates that he was shot at over 100 times, and he was struck on two occasions. At age 18, shortly before he moved to Reno, Williams underwent three separate operations to dislodge a bullet from his chest.

Unable to cope with his reality at home and on the streets, Williams turned to substance abuse at a young age. He was an alcoholic by age 13, and required medical treatment for sniffing glue three weeks after his 14th birthday. He eventually turned to harder drugs like PCP, and his behavior became increasingly self-destructive. At 16, Williams attempted to commit suicide by overdosing on sleeping pills. At 18, distraught over the recent deaths of his grandmother and favorite uncle, Williams drove Aunt Jean's car into oncoming traffic in a busy intersection, resulting in a collision that totaled his aunt's car and left him with a severe head injury.

We cannot agree with the district court that "much of the social history set forth in support of this claim was, indeed, presented to the three-judge panel." The judges heard virtually nothing that would have helped them understand the full extent of the abuse and trauma Williams had endured during his formative years, the role those experiences played in shaping the person he became, and why he might therefore be deserving of mercy. O'Neill only faintly hinted at the adversity Williams faced during childhood, leading the prosecutor to describe her half-hearted "bad background" case as "almost laughable."

Had Williams' counsel been effective, the sentencing judges would have learned that Williams had precisely "the kind of troubled history [the Supreme Court] ha[s] declared relevant to assessing a defendant's moral culpability." *Wiggins*, 539 U.S. at 535. They would have learned that Williams endured relentless violence throughout his childhood and adolescence, and they would have gained insight into his inability to cope with that trauma through testimony describing his increasingly self-destructive behavior. "This evidence may not have made [him] any more likable to the [judges], but it might have helped the [judges] understand [him], and his horrendous acts . . . ." *Sears*, 561 U.S. at 951.

The district court speculated that attempting to present the social history described above, "with witnesses giving conflicting testimony and being subject to cross-examination, would have painted a murky and confusing picture of Williams's childhood." This is precisely the kind of speculation in which the district court should not have engaged without the benefit of an evidentiary hearing, during which the court could actually assess how credible and compelling the testimony would have been. The mitigating evidence submitted in support of Claim 1(F) is sufficient to support the conclusion that Williams has a colorable claim that he was prejudiced by O'Neill's deficient performance. Thus, the district court abused its discretion in denying an evidentiary hearing as to Claim 1(F). *See Stankewitz v. Woodford*, 365 F.3d 706, 725 (9th Cir. 2004).

While the mitigating evidence underlying Claim 1(F) is sufficient on its own to support this conclusion, it is proper in our prejudice analysis to consider the impact this evidence would have had in combination with the evidence of brain

damage underlying Claim 1(A). Claims 1(A) and 1(F) allege related aspects of O'Neill's ineffective assistance in preparing Williams' mitigation case. The claims are formally separate, however, because they were presented and handled piecemeal in the state courts. We are bound by the standard of review attached to each claim, and accordingly defer to the Nevada Supreme Court's conclusion that the brain damage evidence underlying Claim 1(A) is insufficient on its own to raise a reasonable probability that the outcome of Williams' sentencing hearing would have been different. However, that evidence cannot simply be ignored when assessing prejudice as to Claim 1(F).

It is beyond debate that evidence of brain damage can be powerful mitigating evidence. *See Sears*, 561 U.S. at 956; *Porter*, 558 U.S. at 36, 41. Although perhaps insufficient to have altered the outcome on its own, this evidence surely would have had some incremental impact on the sentencing decision. That incremental impact must be factored into the prejudice analysis with respect to Claim 1(F). We have long recognized that the cumulative effect of multiple errors may prejudice a defendant even if no single error in isolation is sufficient to establish prejudice. *See United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). Of course, we cannot consider the cumulative effect of *non*-errors. *Fuller v. Roe*, 182 F.3d 699, 704 (9th Cir. 1999) (per curiam), *overruled on other grounds by Slack v. McDaniel*, 529 U.S. 473 (2000). But the Nevada Supreme Court did not address whether O'Neill's failure to uncover evidence of Williams' brain damage was constitutionally deficient, and reviewing that aspect of the claim *de novo*, we have determined that it was. That failure was part and parcel of O'Neill's deficient performance in preparing Williams' mitigation case, and so it is properly within the scope of our prejudice inquiry. *See*

*Bemore*, 788 F.3d at 1176; *Sanders v. Ryder*, 342 F.3d 991, 1001 (9th Cir. 2003); *Silva v. Woodford*, 279 F.3d 825, 834 (9th Cir. 2002).

We have long recognized not only that "prejudice resulting from ineffective assistance of counsel must be 'considered collectively, not item by item,'" but also that "[t]his is particularly true when . . . the different pieces of mitigating evidence fit together into an internally coherent and compelling narrative whole." *Doe*, 782 F.3d at 460 n.62 (quoting *Kyles v. Whitley*, 514 U.S. 419, 436 (1995)). Evidence of brain damage and childhood abuse often operate in tandem and together "amount[] to classic mitigating circumstances." *Correll*, 539 F.3d at 944; *see also Earp*, 431 F.3d at 1179. That certainly could have been the case here, where the neglected evidence would have been mutually corroborative and reinforcing. The beatings Williams endured may help explain his brain damage (Dr. Schmidt explained that the brain damage was likely caused in part by "blows to his head during his developmental years"), and the history of abuse sheds light on his psychological development (Dr. DePry emphasized the significance of Williams' "turbulent, chaotic and abusive upbringing as it relates to his behavior and personality").

Considering the impact that the evidence of brain damage and childhood abuse might have had in tandem, we have no trouble concluding that Williams has presented a colorable claim that he was prejudiced by O'Neill's deficient performance in preparing the mitigation case. We therefore hold that the district court abused its discretion in denying an evidentiary hearing on Claim 1(F) and remand for such a hearing. Once the evidence underlying that claim has been further developed, the district court will be in a position to

determine whether Williams is entitled to relief. In assessing whether there is a reasonable probability that Williams would have received a different sentence, the district court should consider "the totality of the available mitigation evidence," including the evidence of brain damage, and "reweigh[] it against the evidence in aggravation," bearing in mind that two of the four aggravating factors considered at Williams' sentencing have since been stricken. *Williams v. Taylor*, 529 U.S. 362, 397–98 (2000).[3]

C. Claims 1(B) and 1(G)

We turn next to Williams' contention that the district court erred by denying his request for an evidentiary hearing on two additional ineffective assistance of counsel claims. In Claim 1(B), Williams alleges that O'Neill rendered ineffective assistance during the guilt phase by failing to prepare an adequate defense. In Claim 1(G), Williams contends that O'Neill rendered ineffective assistance during the penalty phase by failing to retain a medical expert who could rebut the State's evidence that Ms. Carlson's murder involved torture.

Williams makes two related arguments that apply equally to both claims. First, he argues that the district court's refusal to hold an evidentiary hearing was predicated on the court's erroneous determination that it could not consider certain

---

[3] Claim 1(H) alleges another related deficiency in O'Neill's penalty-phase representation: her failure to obtain Williams' juvenile records. If after further proceedings on that claim, *see supra* section II.A, the district court concludes that this failure amounts to deficient performance, then any prejudice flowing from it should figure in the court's cumulative prejudice analysis as well.

documentary evidence (declarations, memos, and reports) submitted in support of his claims. Second, he argues that, even if the district court's initial ruling was correct under the law as it then stood, he is entitled to have the documentary evidence considered under the rule subsequently established in *Martinez v. Ryan*, 566 U.S. 1 (2012).

Williams' first argument is without merit. The district court properly held that it could not consider the documentary evidence in question as to the merits of the ineffective assistance issues because Williams did not submit that evidence to the state courts in the manner required under state law.

Williams raised the substance of Claims 1(B) and 1(G) in state petitions for post-conviction relief filed in 1984 and 1992, respectively. The state trial court held evidentiary hearings on both claims and denied relief, rulings that the Nevada Supreme Court affirmed. Williams did not submit any of the documentary evidence at issue here in connection with those earlier petitions. He first presented the evidence to the state courts in his sixth petition for post-conviction relief filed in 2003. The Nevada Supreme Court held that Williams' 2003 petition was untimely under state law and therefore refused to consider the new evidence at all.

The district court correctly held that it could not consider the new evidence Williams submitted to the state courts for the first time in 2003. As the district court recognized, 28 U.S.C. § 2254(e)(2) barred it from conducting an evidentiary hearing to supplement the state court record on Claims 1(B) and 1(G). Section 2254(e)(2) states that if a petitioner "has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an

evidentiary hearing on the claim," with certain statutory exceptions not relevant here. Section 2254(e)(2) bars an evidentiary hearing in federal court if the failure to develop the factual basis of a claim in state court is attributable to a "lack of diligence or some other fault" on the petitioner's part. *Williams v. Taylor*, 529 U.S. 420, 434 (2000).

Here, Williams was not diligent in developing the factual basis for Claims 1(B) and 1(G) in state post-conviction proceedings. All of the information contained in the documentary evidence at issue (which we discuss in greater detail below) could have been presented in Williams' first petition for state post-conviction relief in 1984, had his counsel been diligent in discovering it. Indeed, the state courts refused to consider the new evidence when Williams first presented it in 2003 precisely because his post-conviction petition was untimely under state law. Thus, § 2254(e)(2) required the district court to deny Williams' request for an evidentiary hearing.

Williams' second argument is predicated on the Supreme Court's decision in *Martinez*, which was decided after the district court's initial ruling denying relief on Claims 1(B) and 1(G). *Martinez* carved out a narrow exception to the rule established in *Coleman v. Thompson*, 501 U.S. 722 (1991), which held that an attorney's failure to raise a claim at the proper time under state law does not provide "cause" excusing the resulting procedural default. *Id.* at 757. *Martinez* created a different rule for ineffective assistance of trial counsel claims that, under state law, must be raised in "an initial-review collateral proceeding." 566 U.S. at 17. With respect to such claims, the Court held that "a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the

initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Id.*

Williams relies on *Martinez* to make the following argument. He contends that under Nevada law, ineffective assistance of trial counsel claims must be brought in "an initial-review collateral proceeding." He further argues that the new declarations the district court refused to consider were of such significance that they effectively transformed his ineffective assistance of trial counsel claims into "new" claims never presented to the state courts. Those new claims were therefore procedurally defaulted, he says, but the default is excused under *Martinez* because his counsel in the first post-conviction review proceeding was ineffective for failing to properly raise the claims at that time. The district court is free, Williams concludes, to consider the new claims now, supported by the documentary evidence that the state courts refused to consider in 2003.

Williams' argument relies on our court's decision in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc). There, we held that § 2254(e)(2) does not bar a federal habeas court from considering new evidence supporting a claim of ineffective assistance of trial counsel if the new evidence either "fundamentally alter[s] the legal claim already considered by the state courts or place[s] the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it." *Id.* at 1318 (internal quotation marks and citations omitted). In either of those scenarios, the new evidence transforms the claim into a new claim that the state courts never had an opportunity to adjudicate on the merits. The claim is therefore unexhausted and, if it can no longer be raised in state court, procedurally defaulted as well. It is at that point subject to analysis under

*Martinez* to determine if the default can be excused. *Id.* at 1318–19.

The threshold question, then, is whether the new evidence contained in the declarations at issue places Claims 1(B) and 1(G) in "a significantly different and stronger evidentiary posture," such that under *Dickens* they must be deemed "new" claims not previously presented to the state courts. We conclude that the declarations do not have that effect.

We address Claim 1(B) first, which alleges that O'Neill rendered ineffective assistance by failing to prepare an adequate defense during the guilt phase. When he presented this claim to the state courts in 1984, Williams grounded it mainly on allegations that O'Neill was inexperienced and overworked, and thus ill-equipped to handle a case of this magnitude on her own. Williams alleged that O'Neill was just a few years out of law school and had only recently joined the public defender's office. She had little trial experience, had no experience representing a defendant in a felony case on her own, and had never tried a capital case. And while Nevada law permitted the appointment of two public defenders to represent a capital defendant, O'Neill did not request the assistance of co-counsel. Williams further alleged that O'Neill was overworked and distracted because the public defender's office refused to give her a lighter workload throughout his case. Because O'Neill suffered from a lack of support and experience, Williams argued, she was unable to conduct the research and investigation necessary to prepare an adequate guilt-phase defense.

The new evidence Williams submitted to the district court in support of this claim does not fundamentally alter the nature of the claim or place it in a significantly different and

stronger evidentiary posture. *See id.* at 1318. For example, Williams produced a declaration from an investigator in the public defender's office who worked with O'Neill at the time she represented Williams. He states that O'Neill became overwhelmed shortly after undertaking the representation, and that she never requested his assistance even though he was the investigator assigned to Williams' case. This declaration merely expands on Williams' initial allegation that O'Neill was inexperienced and declined to use all of the resources at her disposal. As an additional item of new evidence, Williams produced a memo from a supervisor in the public defender's office, sent during the period of Williams' representation, stating that due to a staff shortage in the office O'Neill could not "switch[]" her cases with other attorneys. This memo substantiates but does not alter the substance of Williams' earlier allegation in 1984 that the public defender's office refused to give O'Neill a lighter workload to allow her to focus more intently on his case. The remaining documents Williams has produced are of a similar order. None of the new evidence Williams submitted in support of Claim 1(B) had the effect of transforming it into a "new" claim distinct from the claim he had earlier presented to the state courts.

We reach the same conclusion with respect to Claim 1(G). In that claim, Williams alleges that O'Neill rendered ineffective assistance during the penalty phase by failing to obtain a medical expert to rebut the State's evidence of the aggravating circumstance of torture. Williams first alleged the substance of this claim in state court in 1992. The claim relates to the penalty-phase testimony of a pathologist called by the State, Dr. Roger Ritzlin, who testified that Ms. Carlson suffered several different types of knife wounds during the attack: three potentially fatal wounds to the chest; a number

of defensive wounds on Ms. Carlson's hands and arms; and a third type of wound that Dr. Ritzlin described as "punctate" wounds—small, superficial cuts where the skin had been punctured, consistent with the victim having been poked with a knife. Dr. Ritzlin concluded that these superficial puncture wounds were non-fatal and non-defensive in nature. On that basis, he concluded that Ms. Carlson had been tortured before being killed.

In his 1992 petition, Williams alleged that reasonably competent trial counsel would have consulted with independent medical experts and thereby obtained evidence refuting Dr. Ritzlin's testimony that the superficial puncture wounds were the product of torture. Had an independent expert been consulted, Williams alleged, the expert would have testified that the superficial injuries Dr. Ritzlin identified were defensive wounds inflicted during the course of a struggle, rather than wounds inflicted to torture the victim. In particular, Williams alleged that an independent expert would have provided the following opinions:

- The "superficial" or "torture" wounds identified by Dr. Ritzlin are consistent with wounds inflicted during a struggle.

- The blood splatter patterns in the bedroom and the condition of [the] crime scene and the nature and frequency of defense wounds on the victim demonstrate that the killing occurred during a tremendous struggle and is inconsistent with a torture theory.

- • The lack of non-stabbing injuries to the victim and the location of the so-called torture wounds—in the areas of the heart—are inconsistent with Dr. Ritzlin's torture theory.

The new evidence at issue here is a letter report prepared by Dr. Donald Reay, a forensic pathologist who reviewed (among other things) the autopsy report, autopsy photographs, and crime scene photographs, as well as the testimony of Dr. Ritzlin. Dr. Reay opined that there was nothing to suggest that the superficial puncture wounds identified by Dr. Ritzlin were the product of torture. Instead, he concluded that the scattered wounds were defensive in character, likely suffered during the struggle that occurred before the fatal wounds were inflicted. Williams first presented Dr. Reay's report to the state courts in 2003 in connection with his sixth state petition for post-conviction relief. As noted earlier, the state courts refused to consider the evidence on the ground that Williams' petition was untimely.

In our view, Dr. Reay's report does not place Claim 1(G) in a "significantly different and stronger evidentiary posture" than the claim was in when Williams first presented it to the state courts in 1992. Dr. Reay's report, which is less than two pages long, adds little to the detailed allegations Williams set forth in his 1992 petition. Consistent with Williams' earlier allegations, the report concludes that the injuries Dr. Ritzlin identified were likely defensive wounds inflicted during a struggle. Indeed, Dr. Reay's conclusion is based on the same factors that Williams identified in his 1992 petition, including the superficial and scattered nature of the wounds and the absence of any non-stabbing wounds on the victim's body.

To be sure, Dr. Reay's report supports Williams' previous assertions about the conclusions that a medical expert would have reached, had one been consulted. But the two-page report merely corroborates the detailed allegations set forth in Williams' 1992 petition and thus does not transform Claim 1(G) into a new and unexhausted claim. *See Sivak v. Hardison*, 658 F.3d 898, 908 (9th Cir. 2011).

Accordingly, we affirm the district court's denial of an evidentiary hearing on Claims 1(B) and 1(G).

D.  Claim 16

In Claim 16, Williams challenges the constitutional validity of the "avoid lawful arrest" aggravating circumstance, one of the four aggravators originally found by the three-judge sentencing panel. At the time of Williams' trial, that aggravating circumstance required the State to prove that "[t]he murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody." Nev. Rev. Stat. § 200.033(5) (1981). The State's theory in this case was that Williams murdered Ms. Carlson to avoid and prevent his lawful arrest for the burglary of the Carlsons' home. The sentencing judges found sufficient evidence to support that theory. Williams argues that Nevada's avoid-lawful-arrest aggravating circumstance is facially invalid under the Eighth Amendment both because it is too vague and because it fails to adequately narrow the class of death-eligible defendants. He further argues that, as applied to him, the aggravating circumstance violates the Ex Post Facto Clause and the Fourteenth Amendment's Due Process Clause because he lacked adequate notice at the time he committed the offense that § 200.033(5) could be applied

to the facts of his crime. We do not find these contentions meritorious, even reviewing the merits of Claim 16 *de novo*.[4]

We turn first to Williams' Eighth Amendment arguments. He contends that, read most sensibly, § 200.033(5) should be understood to apply only when the defendant's arrest is truly imminent, as when a defendant murders a police officer attempting to take the defendant into custody. The parties agree that the Nevada Supreme Court has rejected that reading of the aggravator. *See Evans v. State*, 926 P.2d 265, 280 (Nev. 1996); *Cavanaugh v. State*, 729 P.2d 481, 486 (Nev. 1986). In Williams' view, rather than adopt his sensible construction of § 200.033(5), the Nevada Supreme Court has instead read it to apply whenever a defendant murders the victim to prevent her from serving as a witness who could later identify the defendant. The problem with that reading, Williams asserts, is that the aggravating circumstance would apply in virtually every murder case, since the victim of the murder could always be a witness if allowed to live. Read that broadly, the aggravating circumstance would likely violate the Eighth Amendment, for the Supreme Court has held that aggravating circumstances must "genuinely narrow the class of persons eligible for the death penalty." *Romano v. Oklahoma*, 512 U.S. 1, 7 (1994) (internal quotation marks omitted). Stated differently, an aggravating circumstance "may not apply to every defendant convicted of murder; it must apply only to a subclass of

---

[4] Like the district court, we review the arguments raised in Claim 16 *de novo* because the Nevada Supreme Court never issued a ruling on the merits of the claim. That is because Williams likely procedurally defaulted the claim by not raising it on direct appeal, or even in his first state petition for post-conviction relief. However, the State never asserted procedural default as a defense to this claim in the district court and has not asserted it as a defense on appeal.

defendants convicted of murder." *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).

The Nevada Supreme Court, however, has construed § 200.033(5) more narrowly than Williams suggests. We have found no case in which the court adopted the broad, constitutionally problematic reading that Williams posits. Instead, the Nevada Supreme Court has upheld application of the aggravating circumstance only when the State has proved that the defendant committed murder for the purpose of preventing the victim from serving as a witness to some antecedent crime (separate from the murder) that the defendant committed. *See, e.g.*, *Jeremias v. State*, 412 P.3d 43, 55 (Nev. 2018); *Blake v. State*, 121 P.3d 567, 577 (Nev. 2005); *Domingues v. State*, 917 P.2d 1364, 1375–77 (Nev. 1996); *Cavanaugh*, 729 P.2d at 486. That is the same limiting construction other States have adopted for their own, similarly worded avoid-lawful-arrest aggravators. *See, e.g.*, *Thompson v. State*, 648 So. 2d 692, 695 (Fla. 1994) (per curiam); *People v. Davis*, 794 P.2d 159, 187 n.22 (Colo. 1990), *overruled on other grounds by People v. Miller*, 113 P.3d 743 (Colo. 2005). We agree with the Eighth and Tenth Circuits that such a limiting construction adequately narrows the class of defendants rendered eligible for the death penalty. *See Davis v. Executive Director of the Department of Corrections*, 100 F.3d 750, 769 (10th Cir. 1996); *Wainwright v. Lockhart*, 80 F.3d 1226, 1231 (8th Cir. 1996).

Williams next contends that the Nevada Supreme Court has inconsistently applied this limiting construction, such that the avoid-lawful-arrest aggravator is unconstitutionally vague. According to Williams, the Nevada Supreme Court has upheld application of the circumstance in some cases involving a defendant who murdered the victim after

committing an antecedent crime, but has arbitrarily rejected application of the circumstance in other cases with the same facts. We do not read the cases as exhibiting this kind of arbitrariness in application. What they demonstrate is that the Nevada Supreme Court requires the State to produce evidence from which the factfinder can reasonably infer that the defendant committed the murder for the purpose of eliminating the victim as a witness for an antecedent crime. Where such proof exists, the court has upheld application of the aggravating circumstance. *See, e.g.*, *Randolph v. State*, 36 P.3d 424, 437 (Nev. 2001); *Cavanaugh*, 729 P.2d at 486. And where the court viewed such proof as lacking, it has rejected application of the circumstance. *See, e.g.*, *Witter v. State*, 921 P.2d 886, 900 (Nev. 1996), *overruled on other grounds by Byford v. State*, 994 P.2d 700 (Nev. 2000); *Jimenez v. State*, 775 P.2d 694, 698 (Nev. 1989). None of these factbound decisions renders the avoid-lawful-arrest aggravating circumstance unconstitutionally vague.

Williams makes one final argument that warrants discussion. He notes that, at the time he committed his offense, the Nevada Supreme Court had not yet held that § 200.033(5) could be applied in a case like his, involving the murder of a witness, as opposed to someone actually involved in effectuating the defendant's arrest. The court first upheld application of the aggravating circumstance in a case involving the murder of a witness more than four years after Williams' offense, in *Cavanaugh v. State*, 729 P.2d 481 (Nev. 1986). Williams argues that he lacked fair notice that the avoid-lawful-arrest aggravator could be applied to the facts of his case, and that any attempt to uphold application of the aggravator based on the Nevada Supreme Court's subsequent interpretation of it would violate the Ex Post Facto Clause.

Judicial interpretation of a criminal statute may not be applied retroactively if the court's decision is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964). We cannot say that the Nevada Supreme Court's interpretation of § 200.033(5) constitutes an "unexpected and indefensible" break with prior Nevada law. Williams has identified no pre-*Cavanaugh* authority from Nevada courts that is inconsistent with the rule *Cavanaugh* adopted, and we have found none. Indeed, *Cavanaugh*'s interpretation of § 200.033(5) accords with a 1978 decision from the Florida Supreme Court interpreting a nearly identical statute, which indicates that the interpretation adopted by the Nevada Supreme Court in *Cavanaugh* reflects a reading of the provision's text that could reasonably have been expected. *See Riley v. State*, 366 So. 2d 19, 22 (Fla. 1978).

### E.  Adequacy of Nevada's Timeliness Bar

The district court held that many of Williams' claims are procedurally defaulted under Nevada Revised Statutes § 34.726. That provision imposes a general one-year deadline for the filing of petitions for post-conviction relief. As noted above, Williams filed his sixth and final state petition for post-conviction relief in March 2003 to exhaust certain of his federal claims. The Nevada Supreme Court declined to consider most of the claims raised in the 2003 petition on the ground that they were untimely under § 34.726. In the district court, the State moved to dismiss the vast majority of Williams' claims, contending that § 34.726 is an independent and adequate state procedural rule that bars federal habeas review. The district court granted the State's motion to dismiss as to many of the claims raised in

Williams' third amended federal habeas petition.  Williams contends that § 34.726 is neither adequate to support the judgment nor independent of federal law and therefore cannot preclude federal review.

Under the procedural bar doctrine, a state court's application of a procedural rule can preclude federal habeas review only if the rule is independent of federal law and adequate to support the judgment.  *Coleman*, 501 U.S. at 729–30.  To be adequate, the rule must be "firmly established and regularly followed" at the time of the purported default.  *Beard v. Kindler*, 558 U.S. 53, 60 (2009) (quoting *Lee v. Kemna*, 534 U.S. 362, 376 (2002)).  The State bears the initial burden of pleading the existence of a state procedural ground.  *Bennett v. Mueller*, 322 F.3d 573, 585–86 (9th Cir. 2003).  If a state procedural ground exists, the burden then shifts to the petitioner, who must assert "specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule."  *Id*. at 586.  If the petitioner carries his burden, the burden shifts back to the State, which must show that the procedural rule "has been regularly and consistently applied in habeas actions."  *Id*.

The State has satisfied its initial burden by pleading the existence of a procedural rule—§ 34.726—that, if applicable, is adequate to support the state court's judgment.  In its order affirming the denial of Williams' final state habeas petition, the Nevada Supreme Court held that the petition was untimely because it was filed 16 years after the resolution of Williams' direct appeal.  The court determined that Williams could not show good cause to excuse his procedural default.

Under *Bennett*, Williams bears the burden of "asserting specific factual allegations that demonstrate the inadequacy of the state procedure." *Id.* In an attempt to meet this burden, Williams contends that the rule was not clearly established or consistently applied at the time of his default. He also argues that his claims are not defaulted because the Nevada Supreme Court addressed them on the merits, and its decision was thus dependent on federal law.

To determine whether § 34.726 is a procedural bar to federal review, we must examine how the rule was applied "at the time the claim should have been raised." *Fields v. Calderon*, 125 F.3d 757, 760 (9th Cir. 1997) (quoting *Calderon v. U.S. District Court*, 103 F.3d 72, 75 (9th Cir. 1996)). This date, known as the "trigger date," *id.*, is not as simple to pin down here as in some of our prior cases. That is because the one-year time bar imposed by § 34.726 did not take effect until January 1, 1993. By that time, Williams had already filed five state post-conviction petitions. So the only petition that could have been rendered untimely by § 34.726 is his sixth and final petition, which he did not file until 2003.

In 2001, the Nevada Supreme Court held for the first time that § 34.726 applies to petitioners who had already filed a petition for post-conviction relief prior to § 34.726's effective date. In *Pellegrini v. State*, 34 P.3d 519 (Nev. 2001), *abrogated on other grounds by Rippo v. State*, 423 P.3d 1084, 1097 n.12 (Nev. 2018), the court held that petitioners seeking to file timely successive petitions had one year from § 34.726's effective date in which to do so. *Id.* at 529. Under *Pellegrini*'s holding, then, Williams had until January 1, 1994, to file his sixth and final state court petition.

Williams argues that it was not possible for him to comply with the 1994 deadline announced in *Pellegrini* because that case was not decided until 2001, long after the deadline had passed. This argument would have greater force if Williams had moved swiftly to comply with *Pellegrini*. But he did not. *Pellegrini* was decided on November 15, 2001, and Williams did not file his sixth state court petition until March 6, 2003, more than 15 months later. The district court held that Williams' default occurred from January 1, 1994, the date by which Williams was required to file his successive petition, through March 6, 2003, the date he filed his last state court petition. But even if we were to restart the clock from the date that *Pellegrini* was decided, Williams' delay was more than the applicable one-year limit, and so constituted post-*Pellegrini* default. *See Bennett*, 322 F.3d at 579 (holding that petitioner's substantial delay *after* the California Supreme Court announced a new procedural rule constituted a period of "continuous" default).

Williams identifies a number of cases in an attempt to establish that § 34.726 has been inconsistently applied. We note at the outset that two of the cases, *Rippo v. State*, 146 P.3d 279 (Nev. 2006), and *Middleton v. Warden*, 98 P.3d 694 (Nev. 2004), were decided after either default date and so are not relevant to our analysis. *See Fields*, 125 F.3d at 761 (explaining that the trigger date is the date the default occurred, not the date the rule was applied by the state court). We note also that, if we were to restart the clock from the date that *Pellegrini* was decided, all but one of the cases Williams cites would fall outside the relevant time period.

In any event, the cases decided within either relevant time period do little to help Williams. In *Bejarano v. Warden*, 929 P.2d 922 (Nev. 1996), the Nevada Supreme Court

dismissed a successive post-conviction petition after applying a different procedural rule, not the timeliness bar of § 34.726. The court added in a footnote that it had considered a claim that the petitioner's counsel was ineffective and "determined that [the claim] is without merit." *Id*. at 926 n.2. But this isolated and passing reference does not demonstrate that the particular state procedural rule here at issue was inadequate. *See Moran v. McDaniel*, 80 F.3d 1261, 1269 (9th Cir. 1996) (explaining that a "brief reference to the record does not establish that the Nevada Supreme Court inconsistently applies that state's procedural bar rule"). Indeed, as the Nevada Supreme Court later explained, the *Bejarano* court's reference to the "merits" of the petitioner's claim was not a decision on the merits; rather, the court was clarifying that the petitioner had failed to show prejudice sufficient to overcome procedural bars. *See State v. Eighth Judicial District Court ex rel. County of Clark*, 112 P.3d 1070, 1079 (Nev. 2005) (*County of Clark*).

Williams' reliance on *Hill v. State*, 953 P.2d 1077 (Nev. 1998), is equally unavailing. In *Hill*, the Nevada Supreme Court reached the merits of an ineffective assistance of counsel claim without discussing procedural bars. Although the ineffective assistance claim was raised more than one year after Hill's conviction, the Nevada Supreme Court stated that Hill's petition was, in fact, timely filed. *Id.* at 1081. The Nevada Supreme Court later clarified in *Pellegrini* that Hill's petition was timely under § 34.726 because the court construed the petition as a timely re-filed or renewed first petition. *Pellegrini*, 34 P.3d at 535.

Next, Williams cites *Ford v. Warden*, 901 P.2d 123 (Nev. 1995). However, we have previously held that *Ford* is "not

relevant" to the question whether § 34.726 has been applied inconsistently. *See Moran*, 80 F.3d at 1270.

Nor does Williams' citation of unpublished authority undermine the adequacy of § 34.726. In *Farmer v. State*, No. 29120, Order Dismissing Appeal (Nev. Nov. 20, 1997), the Nevada Supreme Court did not discuss § 34.726 because it denied a post-conviction petition on a different procedural ground. No. 2:98-cv-00056, Dkt. No. 136-5, at 47. Similarly, in *Nevius v. Warden*, Nos. 29027, 29028, Order Dismissing Appeal and Denying Petition for Writ of Habeas Corpus (Nev. Oct. 9, 1996), the Nevada Supreme Court explained that it was disposing of the petitioner's claims on other procedural grounds, and that its discussion of the merits was "strictly for the purpose of demonstrating that [Nevius] cannot overcome his procedural defaults by a showing of actual prejudice." A reference to the merits of a petition for purposes of determining whether prejudice can excuse a procedural bar does not constitute a decision on the merits inconsistent with the application of a procedural bar. *See Moran*, 80 F.3d at 1269. Finally, in *Feazell v. State*, No. 37789, Order Affirming in Part and Vacating in Part (Nev. Nov. 14, 2002), the only case cited by Williams that was decided within a year of *Pellegrini*, the Nevada Supreme Court vacated the petitioner's capital sentence and remanded for resentencing without referencing the timeliness bar under § 34.726. No. 2:98-cv-00056, Dkt. No. 136-5, at 52–60. But the Nevada Supreme Court later explained that there was good cause to excuse Feazell's late filing. *See County of Clark*, 112 P.3d at 1080.

Even if the cited authority could be deemed sufficient to satisfy Williams' burden under *Bennett*, the State has carried its "ultimate burden" of showing that the state rule "has been

regularly and consistently applied" throughout both relevant time periods. *Bennett*, 322 F.3d at 586. At most, the cases Williams identifies show that the Nevada Supreme Court has occasionally exercised its discretion to consider the merits of untimely petitions. But "a discretionary rule can be 'firmly established' and 'regularly followed'—even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Beard*, 558 U.S. at 60–61. For its part, the State has identified a number of cases, both pre- and post-*Pellegrini*, demonstrating that the Nevada Supreme Court has regularly applied § 34.726 to bar untimely petitions. These decisions show that the Nevada Supreme Court has applied the timeliness rule "in the vast majority" of cases to which the rule applies. *Scott v. Schriro*, 567 F.3d 573, 580 (9th Cir. 2009) (per curiam) (internal quotation marks omitted).

Because Nevada Revised Statutes § 34.726 is an independent and adequate state procedural bar to federal review, we affirm the district court's order dismissing the following claims: 3, 5–7, 10–13, 15, and 17–38.

The district court also initially dismissed several of Williams' ineffective assistance of counsel claims—Claims 1(D), 1(E), 1(H), 1(I), and 1(J)—on the basis that they, too, were procedurally defaulted under § 34.726. After the Supreme Court issued its decision in *Martinez*, the district court recognized that Williams might be able to show cause for this default if he could establish ineffective assistance of post-conviction counsel. However, the district court concluded that these defaulted ineffective assistance of counsel claims were also time-barred under AEDPA's one-year statute of limitations, and so it declined to conduct a *Martinez* analysis. As explained above in section II.A,

Williams is entitled to equitable tolling of AEDPA's statute of limitations, so all of the claims asserted in his September 1999 amended petition are timely under AEDPA. We therefore reverse the dismissal of Claims 1(D), 1(E), 1(H), 1(I), and 1(J) and remand for the district court to determine in the first instance whether Williams' procedural default is excused under *Martinez*.

### F.   Rule 60(b) Motion

After the district court entered final judgment in 2012, Williams filed a motion under Federal Rule of Civil Procedure 60(b) raising a new argument based on *Hurst v. Florida*, 136 S. Ct. 616 (2016). According to Williams, *Hurst* established a new rule in capital sentencing proceedings requiring the factfinder to determine that the aggravating circumstances outweigh the mitigating circumstances beyond a reasonable doubt. In his Rule 60(b) motion, he argued that this new rule entitles him to relief because the Nevada Supreme Court did not apply the beyond-a-reasonable-doubt standard when it conducted its reweighing analysis in 2006 and 2007. The district court denied Williams' motion on the ground that it was a disguised second or successive federal habeas petition. Our court subsequently granted Williams a certificate of appealability on that issue.

Williams challenges the district court's denial of his Rule 60(b) motion in Case No. 17-15768. As a backup, he has also filed an application for leave to file a second or successive petition under 28 U.S.C. § 2244(b)(3) in Case No. 17-71510.

We find it unnecessary to decide whether Williams' Rule 60(b) motion was a disguised second or successive petition.

To expedite resolution of these proceedings, we will assume without deciding that it was not, and that the district court was therefore permitted to rule on the motion. *See Jones v. Ryan*, 733 F.3d 825, 838 (9th Cir. 2013). On the merits, however, it is clear under *Ybarra v. Filson*, 869 F.3d 1016 (9th Cir. 2017), that Williams is not entitled to relief. In *Ybarra*, we held that even if *Hurst* established the new rule Williams urges, that rule would not apply retroactively in cases like this one on collateral review. *Id.* at 1033. Moreover, Williams is not entitled to relief for the additional reason that his Rule 60(b) motion rests on an incorrect factual premise. When the Nevada Supreme Court conducted its reweighing analysis, it expressly applied the beyond-a-reasonable-doubt standard: "After reweighing here, we conclude beyond a reasonable doubt that absent the erroneous aggravators the sentencing panel would have found Williams death eligible and imposed a sentence of death."

We affirm the district court's denial of Williams' Rule 60(b) motion. We deny his application to file a second or successive petition under 28 U.S.C. § 2244(b)(3).

## III. Conclusion

In Case No. 13-99002, we **AFFIRM in part, REVERSE in part, and REMAND** for further proceedings. In particular, we conclude that the district court erred by denying Williams equitable tolling, which requires us to reverse the court's dismissal of Claims 1(C), 1(D), 1(E), 1(H), 1(I), 1(J), 9, and 14 and remand for further proceedings as to those claims. We reverse the district court's denial of Williams' request for an evidentiary hearing on Claim 1(F) and remand for the district court to conduct an evidentiary hearing as to that claim. We affirm the district court's denial

of Williams' third amended habeas petition in all other respects.

In Case No. 17-15768, we **AFFIRM** the district court's denial of Williams' motion under Federal Rule of Civil Procedure 60(b).

In Case No. 17-71510, we **DENY** Williams' application to file a second or successive federal habeas petition.

The parties shall bear their own costs on appeal.