**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| WILLIAM MICHAEL DENNIS, | No.   18-99008 |
| Petitioner-Appellant, | D.C. No. 4:98-cv-21027-JST |
| v. | |
| RONALD BROOMFIELD, Warden of San Quentin State Prison, | MEMORANDUM* |
| Respondent-Appellee. | |

Appeal from the United States District Court
for the Northern District of California
Jon S. Tigar, District Judge, Presiding

Argued and Submitted January 22, 2024
Pasadena, California

Before:  McKEOWN, CLIFTON, and BENNETT, Circuit Judges.

In 1988, a California jury found William Michael Dennis guilty of first-degree murder of his former wife Doreen Erbert and second-degree murder of Doreen's eight-month fetus.  The jury returned a verdict of death on the first-degree murder count, and the trial court sentenced Dennis to death.  The California Supreme Court affirmed Dennis's conviction and sentence, *People v. Dennis*, 950 P.2d 1035 (Cal.

---

    *    This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

1998), and the United States Supreme Court denied certiorari, *Dennis v. California*, 525 U.S. 912 (1998).

In 2001, Dennis filed his federal 28 U.S.C. § 2254 habeas petition. Dennis filed the operative Second Amended Petition ("SAP") in 2003. In 2017, following a three-day evidentiary hearing, the district court denied Dennis's petition, but granted a Certificate of Appealability ("COA") as to three claims. In 2018, Dennis's case was reassigned, and the district court issued an amended order and judgment denying the SAP and expanding the COA to include one additional claim.

Dennis raises four certified issues with respect to the penalty phase: (1) ineffective assistance of counsel ("IAC") for failing to discover and present mental health evidence; (2) IAC for failing to present additional mitigating evidence; (3) IAC for failing to present execution-impact evidence; and (4) cumulative error. He also raises four uncertified issues: (1) IAC for failing to make a meaningful closing argument in the penalty phase; (2) IAC for failing to enter a plea of not guilty by reason of insanity ("NGI"); (3) IAC for failing to present additional mental health evidence in the guilt phase; and (4) conflict of interest.

We review de novo a district court's denial of habeas relief. *Avena v. Chappell*, 932 F.3d 1237, 1247 (9th Cir. 2019). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, governs Dennis's petition because he filed it after 1996. *Murray v. Schriro*, 745

F.3d 984, 996 (9th Cir. 2014). AEDPA "sharply limits" our review of claims adjudicated on the merits in state court. *Johnson v. Williams*, 568 U.S. 289, 298 (2013). Under AEDPA, habeas relief is barred unless the state court's denial of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2). "But for any claim not adjudicated on the merits by the state court, our review is de novo." *Sherman v. Gittere*, 92 F.4th 868, 875 (9th Cir. 2024).

The parties dispute the appropriate standard of review. Dennis concedes that we should review under AEDPA's deferential standard the California Supreme Court's decision that he did not state a prima facie case for IAC, but also argues that because he has satisfied 28 U.S.C. § 2254(d), we should review the remaining issues de novo. The State argues that AEDPA's deferential standard generally applies, but that even when the state court does not supply reasoning for its decision, we should engage in an "independent review of the record," which is "not a de novo review" but is a more complete review of the record under AEDPA's reasonability standard.[1]

---

[1] The State is correct that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary," and "§ 2254(d) does not require a state court

*Murray v. Schriro*, 745 F.3d 984, 996–97 (9th Cir. 2014). We need not resolve this conflict. As discussed below, while we conclude the analysis from the California Supreme Court meets AEDPA's test for deferential review, we also hold that even if we reviewed the relevant issues de novo, we would reach the same conclusions. We affirm the district court's order denying the petition and deny a COA as to Dennis's uncertified claims.

## CERTIFED CLAIMS

I. <u>Trial counsel did not render ineffective assistance when he failed to discover and present certain mental health evidence.</u>

A.     Dennis claims his trial counsel, Nazario Gonzales, failed to (1) present evidence that he had a delusional disorder; (2) conduct a proper investigation that would have allowed the testifying psychiatrist, Dr. Samuel Benson, "to differentiate between depression (his diagnosis) and deterioration into psychotic delusional thinking"; and (3) call another psychiatrist, Dr. Alan Garton, as a witness, because his opinion regarding Dennis's underlying paranoid trends was "considerably more helpful than that of Dr. Benson."

The California Supreme Court rejected this claim on the merits and dismissed it as untimely and successive. Because we assume without deciding that Dennis can overcome any procedural default, *see infra* n.2, we may grant habeas relief for this

---

to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 562 U.S. 86, 99–100 (2011).

4

claim only if the state court's denial "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)–(2). Because the state court's analysis was reasonable, we reject Dennis's claim.

In the district court, the State raised procedural default as an affirmative defense and argued that the California procedural bars provided adequate and independent grounds to reject Dennis's federal habeas claim. While the district court first agreed with the State, it later ruled that the procedural bars were inadequate.[2]

---

[2] Although the district court granted a COA on the substantive IAC claim, the COA grant encompasses this procedural default issue. *See Jones v. Smith*, 231 F.3d 1227, 1231 (9th Cir. 2001) ("[W]here a district court grants a COA with respect to the merits of a constitutional claim but the COA is silent with respect to procedural claims that must be resolved if the panel is to reach the merits, we will assume that the COA also encompasses any procedural claims that must be addressed on appeal.").

Dennis makes no argument on appeal that the procedural bars invoked by the California Supreme Court are not adequate or independent. Accordingly, he has waived that issue. *See, e.g.*, *United States v. Cazares*, 788 F.3d 956, 983 (9th Cir. 2015) ("The failure to cite to valid legal authority waives a claim for appellate review."); *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010) ("Arguments made in passing and not supported by citations to the record or to case authority are generally deemed waived.").

The question now is whether Dennis may successfully excuse this default under *Martinez v. Ryan*, 566 U.S. 1 (2012). To answer that question, we must evaluate Dennis's underlying IAC claims. *See Clabourne v. Ryan*, 745 F.3d 362, 377–78 (9th Cir. 2014), *overruled on other grounds by McKinney v. Ryan*, 813 F.3d 798 (9th Cir. 2015) (en banc). We choose to assume without deciding that Dennis can overcome the procedural default of the underlying claim, and thus we address the merits. *See Franklin v. Johnson*, 290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits issues

5

Following an evidentiary hearing, the district court determined that the California Supreme Court reasonably could have rejected Dennis's argument that Gonzales's representation was deficient because: (1) counsel adequately investigated Dennis's mental health issues; (2) counsel was entitled to rely on Dr. Benson's conclusions; (3) Dr. Benson's testimony was admitted as evidence in the penalty phase; (4) the trial court instructed the jury to consider all evidence, including evidence introduced during the guilt phase; and (5) counsel could have reasonably concluded that Dr. Garton's testimony would not have helped Dennis in the penalty phase.

Dennis argues that Gonzales's investigation into his mental state was deficient because Gonzales abandoned the investigation, limited Dr. Benson's evaluation, and instead focused on establishing whether Dennis was telling the truth about the facts of the crime. To prevail on his Sixth Amendment IAC claim before the state court, Dennis was required to show that Gonzales performed deficiently, and the representation fell "below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Dennis was also required to show that he was prejudiced, which occurs when "there is a reasonable probability that, but for counsel's unprofessional errors,

presented by the appeal, so it may well make sense in some instances to proceed to the merits if the result will be the same.").

6

the result of the proceeding would have been different."[3] *Id.* at 694. Because the California Supreme Court denied this claim on the merits, to prevail on his habeas petition on this claim, Dennis must now "show that the state court's decision is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam) (quoting *Harrington*, 562 U.S. at 103). Because Dennis has failed to meet this burden, we affirm.

When Gonzales was appointed as Dennis's counsel in May 1987, Dennis had already been evaluated by a psychiatrist, Dr. Alfred P. French, who had performed psychological testing and determined that Dennis tested within normal limits. As soon as Gonzales was appointed, he started his investigation into Dennis's mental health as well as his preparation for a possible penalty phase. On May 19, Gonzales met with Dennis and set up a meeting with sentencing resource specialist Patricia Ivey, who subsequently prepared Dennis's social history report together with Jerolyn Roberts ("Ivey/Roberts Report"). Gonzales asked Dennis to prepare an autobiography addressing every stage of Dennis's life, including: painful or memorable experiences, names, and contact information for people who knew

---

[3] Neither the state court nor the district court expressly addressed whether Dennis was prejudiced, as both courts concluded Dennis had failed to show deficient performance. Even were we to separately review the prejudice prong de novo as it was not explicitly addressed by the state court, we would similarly conclude there was no resulting prejudice.

Dennis, his marriage with Doreen, the death of his son Paul, as well as Dennis's thoughts about life, religion, reality, his temper, and his character. Gonzales also met with Dennis's parents and asked them to fill out questionnaires.

Gonzales's mental health investigation continued through the trial and consisted of:

- counsel and defense investigators interviewing Dennis many times, including a follow-up interview just before Dr. Benson's testimony;

- defense investigators interviewing dozens of witnesses and counsel preparing outlines of those interviews;

- the Ivey/Roberts Report;

- counsel collecting various records (police reports, medical records, Kaiser mental health records, school records, work records from Lockheed, records from Dennis's civil suit against Doreen)[4] and preparing outlines of the autopsy and police reports, preliminary examination, and witness testimony at trial;

- counsel sharing all the above with the mental health experts;

- counsel securing the appointment of Dr. Garton by the Superior Court;[5]

_____

[4] Dennis and Doreen's son Paul tragically drowned in a pool at Doreen's house, and Dennis sued Doreen over Paul's death.

[5] The appointment requested by Gonzales and ordered by the Superior Court in February 1988 provided:

> The Court finds that psychiatric information regarding the defendant is needed by defendant's attorney in order to advise the defendant whether to enter or withdraw a plea based upon insanity or to present a defense based upon his mental or emotional condition.

Though Dr. Garton provided a report and information to Gonzales, he never opined that Dennis was insane.

- counsel consulting four mental health experts (Drs. Benson, Garton, Stephenson, and Missett);

- those mental health experts, in turn, consulting three additional mental health experts;

- Drs. Benson and Garton interviewing Dennis many times, including a drug-assisted interview, having some of those interviews video-recorded, and counsel sharing the recordings with the other mental health experts;

- Dr. Garton administering psychological tests to Dennis;

- counsel explaining to mental health experts the law in California regarding the different degrees of murder and manslaughter and defenses based on mental illness or insanity; and

- counsel asking mental health experts to let him know what other information they might need.

Thus, the record shows that Gonzales diligently and thoroughly investigated and analyzed Dennis's mental health.

B.    Dennis argues that Gonzales performed deficiently in failing to order *neuropsychological* testing. Despite Dennis's argument to the contrary, the testing performed by Dr. Dale Watson did not show that Dennis had temporal lobe damage. One test showed an unusual discrepancy between auditory memory and visual memory indexes, which could be explained by a dysfunction in the left temporal lobe or by Dennis's hearing problems. Dr. Watson could have done more testing, such as a Magnetic Resonance Imaging or a Positron Emission Tomography scan, but did not. Other tests that likely would have shown potential brain damage had it

been present, such as the Benton Judgment of Line Orientation Test, the Rey Complex Figure Test, the Tactual Performance Test, and Trail Making A and B test, yielded normal results. Dennis informed Gonzales that he "never had any indication of brain damage." Given these test results and given that none of the experts who evaluated Dennis pre-trial suggested that neuropsychological testing should be administered, Gonzales was not deficient in failing to pursue such testing. *See Runningeagle v. Ryan*, 825 F.3d 970, 987 (9th Cir. 2016) (stating that a mental health declaration with "no affirmative diagnosis" is not materially mitigating).

Dennis's argument that Gonzales curtailed the investigation by focusing on whether Dennis was telling the truth rather than pursuing a mental health defense is unsupported by the record. Dennis relies on Dr. Benson's 2013 declaration and his 2014 testimony at the evidentiary hearing, in which Dr. Benson claimed that the purpose of the 1988 mental health evaluation was to determine whether Dennis was truthful "about some issues regarding the killing of Doreen" and that he "was not asked to determine whether . . . Dennis[] suffered from a mental illness that could negate a finding that he killed his ex-wife with malice." Dr. Benson also testified that Gonzales wanted to conduct the sodium amytal ("truth serum") examination, although he did not discourage Gonzales from going forward with it.

10

But this testimony 26 years after the trial is contradicted by evidence contemporaneous with the pretrial and trial period,[6] including (1) counsel specifically requesting that Dr. Benson evaluate Dennis's mental health;[7] (2) Dr. Benson's testimony at trial diagnosing Dennis with mental illness;[8] (3) counsel

---

[6] We agree with the district court that "it appears that Dr. Benson's own inferences about trial counsel's motivations and goals differed from what trial counsel was communicating to Dr. Benson in various letters."

[7] For example, on May 3, 1988, Gonzales wrote Benson:

> How long will it take you to prepare a complete report, which includes documentation for your opinion that he suffered from a mental disease or disorder at the time of the homicide?

Dr. Benson never provided any such report.

On June 23, 1988, Gonzales wrote Dr. Benson:

> Right now it is critical that we focus on whether or not you can honestly and intellectually testify that Mike suffered from a mental disease or disorder at the time of the killing. So far, I have provided you with every piece of information in my file of which I am aware. If you need additional information, please tell me what you need and I will try to get it for you.
>
> * * *
>
> Simply stated, can you say that at the time of the killing Mike suffered from a mental disease or disorder?

Again, Dr. Benson never provided Gonzalez any diagnosis other than what Dr. Benson testified to at trial.

[8] At the evidentiary hearing, Dr. Benson explained that he opined on Dennis's mental state during his trial testimony, despite Gonzales's instructions, because "when evaluating someone, you have to evaluate their mental state" and Dennis's delusions were "too huge not to mention."

11

providing Dr. Benson with jury instructions on murder, degrees of murder, manslaughter, the definition of malice, the definition of deliberation, and case law on mental health defenses; and (4) counsel consulting other experts about Dennis's mental health rather than his veracity.[9]

We agree with the district court that "trial counsel's letters to Dr. Benson show that counsel repeatedly did seek to prepare Dr. Benson to testify to a legally cognizable defense prior to trial." We also agree with the district court that:

> [N]one of the reports or correspondence submitted to trial counsel by his experts, including Dr. French, Dr. Ste[ph]enson, Dr. Garton, and Dr. Benson, made a finding that Petitioner was insane at the time of the crimes despite trial counsel's correspondence suggesting a potential insanity defense based upon their opinions and reports.

In short, even if there were a missed diagnosis, Dennis cannot use that to support supposed ineffectiveness by counsel, when Dennis was subject to intensive evaluations by multiple competent and carefully selected mental health experts, who never made the diagnosis Dennis advanced decades later. *See Crittenden v. Ayers*, 624 F.3d 943, 966 (9th Cir. 2010) ("Attorneys are entitled to rely on the opinions of properly selected, adequately informed and well-qualified experts.").

II.  Trial counsel did not render ineffective assistance when he failed to present additional mitigating evidence in the penalty phase.

---

[9] We also note that although the district court authorized Dennis's counsel to depose Gonzales, as counsel conceded at argument, they chose not to do so. *See* Oral Arg. at 22:18–22:40 (asking defense counsel, "You never put on any evidence as to why Mr. Gonzales did or did not choose to go forward with an NGI defense?" to which counsel replied, "That is correct. We did not have him testify, nor did the state.").

12

In Claim 18(b)(1), Dennis alleged that counsel was ineffective for failing to present "a mass of critical evidence" in the penalty phase. In the district court, as part of Claim 17, Dennis also alleged that trial counsel failed to present evidence of Dennis's good behavior in prison and ability to adjust to prison life. The SAP did not cite any declarations or any other evidence in support of this allegation. On appeal, Dennis argues both Claim 18(b)(1) and this part of Claim 17 with the second certified issue. We thus discuss them together.

In Claim 18(b)(1), Dennis argued Gonzales should have presented evidence of: (1) Dennis's struggle with hearing problems and stuttering; (2) his attendance in special education classes; (3) his social isolation; (4) his parents' divorce, leading to Dennis developing an eating disorder and undergoing liposuction; (5) Dennis's depression as a teenager and bowling as his source of pride; (6) Dennis's suicide attempt at age 19; (7) Dennis's close and loving relationship with his son, Paul; and (8) how upset Dennis was after Paul's death and how he lost touch with reality. Dennis first raised this claim in his initial state habeas petition. In contrast to the federal court proceedings, in state court Dennis claimed only that counsel should have presented evidence of Dennis's hearing problems and loving relationship with

Paul.[10]  Dennis acknowledged that Gonzales did present lay testimony about his hearing problems but claimed it should have been supplemented with expert testimony about the effect such an impairment had on Dennis and his mental health. Gonzales did not submit any expert declarations in support.  As for Dennis's relationship with Paul, Dennis argued that counsel should have presented copies of the divorce decree between Dennis and Doreen and the cancelled checks for child support payments in excess of the court-ordered amounts.  In 1998, the California Supreme Court summarily denied on the merits the claim as it was raised in Dennis's first state habeas petition.

In Claim 17 in the district court, Dennis alleged that trial counsel failed to present evidence of Dennis's good behavior in prison and ability to adjust to prison life.  Dennis first raised this claim in the second state petition.  The California Supreme Court summarily denied the claim on the merits and also dismissed it as procedurally defaulted.

---

[10] In the district court, Dennis maintained that this claim was exhausted and cited pages 5–7 of the first state petition.  Although the State first disputed exhaustion because very few allegations in support of Claim 18(b)(1) appeared in the first state petition, it ultimately agreed that the claim was exhausted.

On appeal, the State does not argue that the new allegations altered and transformed this claim into a new unexhausted and now procedurally defaulted claim.  Thus, we analyze it as if it were exhausted and not procedurally defaulted. *But see Williams v. Filson*, 908 F.3d 546, 572–73 (9th Cir. 2018) (explaining that new evidence can sometimes transform an exhausted claim into a new unexhausted claim).

Therefore, for the part of the second certified issue based on the allegations of Dennis's hearing problems and loving relationship with his son, as well as the allegations of Dennis's good behavior in prison and ability to adjust to prison life,[11] we may only grant habeas relief if the state court's denial "was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(1)–(2). Because the state court's analysis was reasonable, we reject Dennis's claim. For the remainder of the second certified issue based on the other allegations not presented to the California Supreme Court, we assume without deciding that Dennis can overcome the procedural default. But even under a de novo standard of review, Dennis cannot show that counsel was ineffective or that Dennis was prejudiced.

In the district court, the State moved for summary judgment on the claim. In 2008, the district court granted summary judgment for the State. The district court reasoned that although "counsel's mitigation presentation was minimal," Gonzales did present "some evidence" on the issues identified by Dennis and additional evidence would have been "largely duplicative" and would not have affected the outcome.

---

[11] We assume without deciding that Dennis could overcome the state court's procedural default ruling as to these allegations.

Dennis cannot prevail on this claim because it is both unsupported and rebutted by the trial record. *Cullen v. Pinholster*, 563 U.S. 170, 185 n.7 (2011), bars consideration of the evidence Dennis relies on in this appeal, because Dennis did not present it in state court. The only evidence Dennis attached to his first state court petition—divorce records and cancelled child support checks—is a far cry from Dennis's allegation that "a mass of critical evidence" was not presented.

But even putting that aside, though Gonzales failed to call *all* possible witnesses regarding the mitigating information listed above, the new evidence is duplicative of the mitigation evidence Gonzales *did* present. *See Rogers v. Dzurenda*, 25 F.4th 1171, 1189 (9th Cir. 2022) (stating that opening statements help "contextualize the evidence the jury will hear and . . . help the jury understand each side's theory of the case"). During his guilt phase opening statement, Gonzales informed the jury:

> We are going to present psychiatric evidence, a psychiatrist. He's going to tell you that when . . . Dennis killed Doreen, that he was suffering from a mental illness . . . . He's going to tell you about what lead [sic] up to this mental illness: the fact that he was hard of hearing as a youth; how he was placed in mental retardation classes; they thought he was mentally retarded; how the self-esteem factor became so brittle and so endangered.

Gonzales then presented testimony from Dr. Benson, who informed the jury of Dennis's hearing problems and stuttering, special education classes, the resulting social isolation, the effect of Dennis's parents' divorce, his depression as a teenager

16

and how unusual it was for a male teenager to attempt to commit suicide because he could not find a girlfriend, Dennis's nonviolent nature, and how Paul's death devastated him. Dr. Benson's testimony was also admitted in the penalty phase.

Gonzales complemented expert testimony with lay witnesses in the guilt phase, including Dennis's mother and his friends, who testified on the same subjects Dennis now advances. Joseph Escobar, a close friend since high school, testified that Dennis's friends made fun of his stuttering: "[I]t was easy to make him the butt of jokes[.]" Dennis's mother testified about Dennis's hearing problems, the history of hearing and speech problems in the family, and Dennis attending special schools for the hearing impaired. Ronald Christian testified that Dennis talked about Paul "a lot" prior to Paul's death and Paul "meant a lot to him." In addition, most of the 16 lay witnesses who testified during the penalty phase corroborated the same information. Lila Vest, Dennis's insurance agent, testified that she "admired [Dennis] that he was so diligent about seeing his child regularly and paying child support." Arlene Arken, Dennis's former stepmother, who saw Dennis every Sunday from age 12 to 18 and was very close with Dennis, testified about the impact on Dennis of his hearing and speech problems and his parents' divorce. Robert Webb, who rented a room from and socialized with Dennis after Paul's death, testified that Dennis was hurting over the loss of his son, depressed, and lonely, and that Dennis blamed Doreen for Paul's death. The cassette tape that Dennis recorded

17

of his conversation with two-year-old Paul was played for the jury and admitted into evidence. Additional evidence would have been cumulative. *See United States v. Schaflander*, 743 F.2d 714, 718 (9th Cir. 1984) (per curiam) (holding that the testimony of 28 uncalled witnesses would have been cumulative of the 15 defense witnesses called at trial).[12]

Dennis faults Gonzales for failing to call an expert social historian in the penalty phase to "synthesize" this social history and connect it to Dennis's mental health. But Dennis has presented no declaration from such a historian, and Dr. Benson drew these connections for the jury. According to Dennis's legal expert Thomas Nolan, at the time of Dennis's trial, "it was standard practice for defense counsel in capital cases to obtain and present the client's social history by way of a social historian, psychologist, *or* psychiatrist." (emphasis added). That is what was done here. Dennis's social history was presented through Dr. Benson, a psychiatrist.

Dennis also alleged in the district court that Gonzales failed to present evidence of his good behavior in prison. The district court denied this claim,

---

[12] As the district court concluded:

> It may be that other evidence would have been stronger than the evidence actually presented; indeed, there can be little doubt that counsel's mitigation presentation was minimal; even so, any additional presentation would have been largely duplicative. There is no reasonable probability that the additional evidence contemplated in this subclaim would have affected the outcome of the penalty phase.

18

determining that Dennis's counsel "reasonably could have made a strategic decision not to open the door for the prosecution to introduce evidence to rebut any 'future dangerousness' evidence presented by the defense."

We agree with the district court that this could have been a reasonable strategic decision by Gonzales. We also conclude there was no showing of prejudice. "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered *potentially* mitigating." *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) (emphasis added). Nolan declared that such evidence was typically presented "through experts who drew upon the defendant's social history, adjustment to structured and institutional settings, and the likely conditions under which the defendant would serve a[] [life without parole] sentence as well as opining upon the defendant's likely future adjustment." But Dennis has presented no such expert. And the only evidence that Dennis relies on is the probation report prepared *after* the jury reached the death verdict. Thus, Dennis fails to show either that Gonzales was ineffective, or that even if Gonzales were ineffective, that Dennis was prejudiced.

III. <u>Trial counsel did not render ineffective assistance by failing to ask penalty phase witnesses if they wished the jury to spare Dennis's life.</u>

Dennis alleged that Gonzales was ineffective for failing to ask any of the penalty phase witnesses if Dennis's life should be spared. Dennis contended that several would have pleaded for his life if they were given the opportunity.

19

According to Dennis, he was prejudiced because Gonzales's failure allowed the prosecutor to argue during the penalty phase closing argument: "Not one, not one [witness] asked that his life be spared. Not one had the nerve."[13] (alteration in original).

Following an evidentiary hearing on the mental-health claims,[14] the district court denied Dennis's IAC claim regarding Gonzales's failure to ask penalty phase witnesses to spare Dennis's life. The district court found that counsel was deficient in failing to present the evidence of six witnesses pleading for mercy, but concluded that Dennis had not shown prejudice. The district court determined that the additional mitigating value of such testimony was questionable, especially in the context of nature and quantity of the testimony about Dennis that counsel did present

---

[13] Dennis did not raise this claim in state court. In the district court, he asserted that he exhausted the claim by referring to the briefing on direct appeal and the first state habeas petition. But those filings only show that Dennis raised a prosecutorial misconduct claim based on the prosecutor's argument that no one "had the nerve" to plead for his life. This is insufficient to establish exhaustion. *See Arrendondo v. Neven*, 763 F.3d 1122, 1138 (9th Cir. 2014) ("To fairly present a federal claim, a state prisoner must present to the state courts both the operative facts and the federal legal theories that animate the claim."). But a state may expressly waive the exhaustion requirement, *see* 28 U.S.C. § 2254(b)(3), which the State has done so here by communicating to the district court that it did not intend to pursue the exhaustion argument and stipulated that Dennis had exhausted the claim.

[14] The district court "bifurcated the evidentiary hearing, ordering that the first phase of the hearing would address only [Dennis]'s mental-health claims, i.e., claims 3, 11, and 17." No evidentiary hearing was ever held on Claim 18.B.7.

at the penalty phase.[15] The district court noted that the disparity between the prosecution's "minimal presentation" in aggravation and Dennis's 16 witnesses in mitigation, as well as short jury deliberations, further supported the finding of no prejudice. The State argues on appeal that the district court was correct that there was no prejudice. We agree with the district court and the State that there was no prejudice. We also hold that the district court's deficiency determination was incorrect.

First, Dennis fails to rebut the strong presumption of counsel's competence mandated by *Strickland*. "[T]actical decisions at trial, such as refraining . . . from asking a particular line of questions, are given great deference and must . . . meet only objectively reasonable standards." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000). The district court erred when it held that the execution impact evidence was relevant and admissible at the time of Dennis's trial. The district court relied on *People v. Ochoa*, 966 P.2d 442, 506 (Cal. 1998), an opinion issued 10 years after Dennis's trial, in which the California Supreme Court held—for the first time—that "family members may offer testimony of the impact of an execution on them if by

---

[15] The district court concluded: "The proffered evidence, which would not have substantially changed the overall thrust of [Dennis]'s penalty phase presentation, would therefore have been cumulative to the testimony from most of [Dennis]'s friends and family. Accordingly, [Dennis] has not shown prejudice as a result of counsel's failure to elicit explicit requests for mercy from [Dennis]'s penalty phase witnesses."

so doing they illuminate some positive quality of the defendant's background or character." But until then, the law regarding execution impact evidence in California was unsettled. *People v. Camacho*, 520 P.3d 548, 595–96 (Cal. 2022); *see also People v. Cooper*, 809 P.2d 865, 908 n.14 (Cal. 1991) ("We need not now decide whether evidence of the impact on the defendant's family comes within this 'broad' range of constitutionally pertinent mitigation.").

In 1995, when presenting the related prosecutorial misconduct claim on direct appeal, Dennis argued that, had Gonzales tried to elicit the witnesses' opinions on the appropriate penalty, the prosecutor would have objected based on relevancy. Thus, even Dennis's appellate counsel believed that such testimony would (or might) not have been admitted, given the state of the law before *Ochoa*. That is likely why Dennis's appeal included a prosecutorial misconduct claim based on these facts, but not a related IAC claim.

Second, even if the district court were correct as to deficient performance, we conclude that there was no *Strickland* prejudice. Dennis must establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

The very appearance of Dennis's relatives and friends on the witness stand, their testimony about his many good qualities, and the fact that they remained close with him after his incarceration, unambiguously conveyed their wish that Dennis not be executed. Gonzales also told the jury in his penalty phase closing that a life without parole sentence meant "the ability to be able to remember his friends, perhaps to have someone like Ted Grish come and visit him." Gonzales further argued that it said a lot about Dennis as a human being that Ted Grish testified for him, visited him in jail, and would love to go bowling with him. It was unnecessary for Gonzales to present the execution-impact testimony in any particular form. Given that the proffered evidence would not have substantially changed the overall thrust of Dennis's penalty phase presentation, we cannot conclude that Dennis has shown a "reasonable probability" that the result of his penalty trial would have been different. *Strickland*, 466 U.S. at 694. Accordingly, Dennis cannot show that he was prejudiced by Gonzales's failure to elicit direct statements evidencing the witnesses' desire for Dennis to live.

IV.    As there was no error, there was no "cumulative" error.

Dennis separately argues that the cumulative effect of these alleged errors required a reversal of his conviction and sentence. But because there was no error, there is no prejudice to accumulate.

**UNCERTIFED CLAIMS**

23

Dennis presents four uncertified IAC claims. We decline to issue a COA for any. To obtain a COA on these claims, Dennis must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S. 100, 115 (2017) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003)). "This threshold question should be decided without 'full consideration of the factual or legal bases adduced in support of the claims.'" *Id.* (quoting *Miller-El*, 537 U.S. at 336).

With respect to IAC claims, we have held that a COA should not be limited to separate or individual subclaims. *See Browning v. Baker*, 875 F.3d 444, 471 (9th Cir. 2017). Rather, because a COA issues for "the denial of a *constitutional right*," it must encompass "counsel's conduct *as a whole* to determine whether it was constitutionally adequate." *Id.* (expanding COA beyond a certified subclaim to "include whether [appellant] was denied effective assistance of counsel by his trial lawyer's wholesale failure to investigate and prepare for trial" (internal quotation marks omitted)). But when the certified and uncertified IAC claims involve different phases of proceedings, the *Browning* rule does not apply. *See McGill v. Shinn*, 16 F.4th 666, 679 (9th Cir. 2021) (granting a COA on penalty phase IAC claim under

24

*Browning* but denying a COA on guilt phase IAC claim because counsel's omission occurred during a "separate and discrete" phase), *cert. denied*, 143 S. Ct. 429 (2022).

AEDPA's deferential treatment of state court decisions is incorporated into consideration of a habeas petitioner's request for a COA. *Miller-El*, 537 U.S. at 341 (holding that when AEDPA applies, the question on a COA application is "whether the District Court's application of AEDPA deference, as stated in §§ 2254(d)(2) and (e)(1), to petitioner's . . . claim was debatable amongst jurists of reason").

I. <u>Trial counsel was not ineffective by failing to make a "meaningful" closing argument.</u>

Dennis alleges that Gonzales failed to deliver an effective penalty phase closing argument. Dennis relies on the beginning of Gonzales's argument: "Be honest with you, I kind of feel . . . helpless right now. I heard [the prosecutor] ask for death and gave all of her reasons why you should kill him . . . . [I] didn't have much time really to sit down and prepare a long articulate speech for you . . . ." Dennis contends that Gonzales then continued with "a rambling, disjointed and largely incoherent discourse." Dennis also faulted counsel for failing to mention the statutory mitigating factors.

The California Supreme Court denied this claim on the merits on direct appeal. It concluded that Dennis failed to show that counsel was deficient or that Dennis was prejudiced. The California Supreme Court reasoned that Dennis's "criticisms of his counsel's closing arguments amount[ed] merely to disagreements

25

about matters of style and technique" and that Gonzales reasonably employed "a humble and respectful tone that acknowledged the jury's ultimate responsibility for [Dennis]'s fate."

The district court granted summary judgment to the State. The district court characterized Gonzales's closing argument as weak, but not deficient, and concluded that Dennis did not establish prejudice. We agree and decline to expand the COA to include this claim because Dennis fails to show that, even considering Gonzales's conduct as a whole, the district court's resolution of the issue was debatable amongst jurists of reason.

Counsel was not ineffective by allegedly failing to make a "meaningful" closing argument. The purpose of a closing argument is to "sharpen and clarify the issues for resolution by the trier of fact, but which issues to sharpen and how best to clarify them are questions with many reasonable answers." *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) (per curiam) (cleaned up). The jury rejected the non-NGI mental health defense that Dennis presented during the guilt phase. Thus, Gonzales reasonably focused his penalty phase argument on other mitigating evidence that portrayed Dennis as a grieving father, and he made a plea for leniency based on the torment and pain Dennis experienced over the loss of Paul. Gonzales repeatedly reminded the jury about the tape of Dennis and Paul recorded a year before Paul's death and described it as evidence of Dennis's love for Paul. Gonzales spoke to the

26

jury about the bond he developed with his own son, the same bond that Dennis and Paul shared, and stated that he would trust his own child to Dennis's care. Gonzales pointed out that Dennis was 34 years old at the time of his arrest and throughout his life, he worked hard, helped provide a place for his mother, and took care of his brother. While Dennis now argues for a different closing argument, the actual argument was not constitutionally deficient. Because Dennis has not "made a substantial showing of the denial of a constitutional right" even considering Gonzales's conduct as a whole, and because Dennis has failed to show that jurists of reason could disagree with the district court's resolution, we decline to expand the COA to include this claim. *See* 28 U.S.C. § 2253(c)(2).

II. <u>Trial counsel was not ineffective in failing to enter an NGI plea.</u>

Dennis alleged that counsel was ineffective because he failed to sufficiently investigate and then present an insanity defense, despite evidence of Dennis's alleged delusionary belief system which supposedly made Dennis unable to understand that his acts were morally wrong. The California Supreme Court denied this claim on the merits and dismissed it as untimely and successive. The district court ordered an evidentiary hearing on this claim and then denied it but did not issue a COA.

The district court concluded that the state court record showed Gonzales was not deficient because he sought out mental health evaluations, provided the experts

27

with substantial materials to review, and was ultimately unable to obtain any opinion supporting an insanity defense from the experts. The supplemental record developed during the federal proceedings also showed that Gonzales actively considered the insanity defense, researched it, and consulted mental health professionals about it. The record also included evaluations by mental health specialists at the jail and in prison affirmatively finding Dennis sane before trial and shortly after. In addition, the district court determined the entire record belied Dennis's allegations that Gonzales failed to provide sufficient materials to the experts to enable them to opine that Dennis was insane. The district court also disagreed with Dennis that counsel had nothing to lose by entering an insanity plea. The district court determined that Gonzales did not render deficient performance and declined to evaluate prejudice.

On appeal, the State reasserts procedural default as an affirmative defense. Dennis argues only the merits of the claim, and requests a remand, if the panel "determines the default question should be addressed." Again, we assume without deciding that Dennis can overcome the procedural default.

We agree with the district court and decline to expand the COA to include this claim because Dennis does not show that reasonable jurists could disagree with the district court. In California, to assert an NGI defense, a defendant must show that due to his mental condition, he was unable either to understand the nature and quality of the criminal act or to distinguish right from wrong when committing the act. Cal.

28

Penal Code § 25(b);[16] *see also People v. Elmore*, 325 P.3d 951, 962–63 (Cal. 2014). A defendant bears the burden of proving by a preponderance of the evidence that he was legally insane when he committed the crime. Cal. Penal Code § 25(b).

Dennis contends that Gonzales should have entered an NGI plea in addition to a not guilty plea, because Dennis could not distinguish what was morally right from what was morally wrong at the time of the crimes. Dennis relies on Dr. Woods's opinion that Dennis "believed that what he was doing was the correct thing to do morally." Dennis contends that he had a delusion that Doreen intentionally murdered Paul, and that he tried to have the legal system declare Doreen responsible for it to no avail. Because the legal system broke down, he believed that he needed to do what the system refused to do.

The record shows that Gonzales was not deficient in not presenting an NGI defense. At the initial interview on May 20, 1987, Dennis told Gonzales that he had been examined by a psychiatrist and he was "not insane." Gonzales later contacted multiple mental health professionals to explore mental health defenses, including an NGI defense. None opined that Dennis was insane. Based on his investigation and consultation, Gonzales reasonably concluded that there was no foundation for an NGI defense.

---

[16] Cal. Penal Code § 25 has not been amended since it was enacted in 1982.

Moreover, as the habeas record amply reflects, entering an NGI plea would have opened the door to the prosecution presenting evidence that Dennis was not mentally ill, but instead had an antisocial (or sociopathic) personality disorder.[17]

But in addition, Dennis's conduct reflected overwhelming evidence that he understood that killing Doreen was morally wrong. For example, after the crimes, Dennis provided what the State's habeas expert psychiatrist Dr. Marc Cohen described as 23 versions of the relevant events, including many that were completely exculpatory and in which Dennis denied any involvement in the crimes or suggested the possible motive of others to have committed the crimes.[18] And Dennis chose to commit the crime on Halloween to disguise his identity and evade detection, stating, "[i]t was Halloween, and I was thinking that—that way I would not be recognized." After the crimes, Dennis discarded the incriminating evidence, including his bloody clothes and the machete he used to murder Doreen.

---

[17] In a similar context, this court recently noted this possibility. *See Kimble v. Davis*, Nos. 17-99002, 17-99003, 2023 WL 4231717, at *2 (9th Cir. June 28, 2023) ("Had counsel introduced evidence of Kimble's difficult childhood and . . . various mental illnesses, the State would have introduced evidence of Kimble's antisocial personality disorder ('ASPD') . . . . Thus, when viewed alongside the State's penalty-phase rebuttal evidence, the penalty-phase evidence Kimble [wanted to introduce] . . . was 'by no means clearly mitigating, as the jury might have concluded that [Kimble] was simply beyond rehabilitation.'" (second alteration in original) (quoting *Cullen*, 563 U.S. at 201)).

[18] As one example, when officers advised Dennis that Doreen had been murdered, he responded: "'You're kidding' in 'a calm, expressionless demeanor.'" A second example is Dennis telling officers that "perhaps the killing was related to drugs . . . ."

Dennis also never told anyone the exact location where he disposed of that incriminating evidence.  Prior to Dr. Benson's testimony, Gonzales's investigator asked Dennis the reason for the secrecy.  Dennis responded that he wanted no one to know exactly what happened: "Well, I didn't want a bloody machete sitting in my house . . . .  I was hoping not to get caught."

All this evidence, including evidence of a cover-up, was inconsistent with the defense that Dennis did not know the murders were morally wrong.  *See Wong v. Belmontes*, 558 U.S. 15, 24–25 (2009) (finding no prejudice where evidence of "the cold, calculated nature of the . . . murder . . . would have served as a powerful counterpoint" to evidence of "an 'extended bout with rheumatic fever,' which led to 'emotional instability, impulsivity, and impairment of the neurophysiological mechanisms for planning and reasoning'" (citation omitted)).  Moreover, "a defendant's unsuccessful attempt to raise an insanity defense positively correlates with a death penalty verdict."  Michael L. Perlin, *The Sanist Lives of Jurors in Death Penalty Cases: The Puzzling Role of "Mitigating" Mental Disability Evidence*, 8 Notre Dame J.L. Ethics & Pub. Pol'y 239, 246 (1994); *see also Weekley v. Jones*, 76 F.3d 1459, 1463 (8th Cir. 1996) (en banc) ("[T]here is considerable empirical evidence that insanity pleas in and of themselves are not received favorably by jurors.").

Similarly, the record shows that Gonzales, who had known Dennis for more than a year prior to his trial and interviewed him multiple times, had reason to doubt that Dennis was unable to distinguish moral right from wrong or that he was motivated by bringing an alleged murderer (Doreen) to justice. In notes of his interviews with Dennis, Gonzales described Dennis's grievances:

> [Dennis] contends that there is no justice at all. The State wants to execute a man who is a MR. NICE GUY. He is sure he will be gassed to death because he lost his son to a woman who cheated on him while they were married, and started dating a married man the day they separated. She also lied to protect All State Insurance Company. "And for this I die?"

Gonzales also made these notes during his telephone call with Dr. Stephenson: "Reputation of being 'wimp.' Last 'wimp' act. No longer a wimp. Wants world to say 'What you did was understandable, and you are not a wimp.'" Based on the expert opinions and on Dennis's own descriptions of his motivation for the crimes, Gonzales drew his own conclusions about Dennis's sanity and his ability to understand that his actions were wrong. *See Dunn v. Reeves*, 594 U.S. 731, 741 (2021) (per curiam) ("It is not unreasonable for a lawyer to be concerned about overreaching."). Because Gonzales's performance was not deficient, Dennis was not prejudiced. *See Strickland*, 466 U.S. at 697. Therefore, we deny Dennis's request for a COA.

III. <u>Trial counsel was not ineffective in failing to present additional mental health evidence in the guilt phase.</u>

32

Dennis alleged that in addition to failing to enter an NGI plea, Gonzales failed to present other evidence in the guilt phase regarding Dennis's mental state at the time of the murders. This evidence included the diagnosis of Dennis's alleged delusional disorder, Dr. Garton's preliminary report, Dr. French's report, and Dr. Stephenson's opinion about Dennis's grief. Dennis claims that had this evidence been presented, he would only have been convicted of voluntary manslaughter for the killing of both Doreen and the fetus. The California Supreme Court denied this claim on the merits and dismissed it as untimely and successive.

In the district court, the State again raised procedural default as a defense to this claim. The district court rejected the State's defense and ordered an evidentiary hearing on this claim. Following the evidentiary hearing, the district court denied the claim. The district court concluded that Dennis failed to explain how any of the expert testimony Dennis presented would negate malice such that Dennis would have been entitled to a conviction of voluntary manslaughter. The district court observed that evidence of Dennis's delusions appeared to establish rather than negate deliberation and malice aforethought. The district court denied a COA on this claim.

We agree and decline to expand the COA to include this claim because Dennis does not show that reasonable jurists could disagree with the district court. On appeal, the State reasserts procedural default as an affirmative defense and again we

33

assume without deciding that Dennis can overcome the procedural default. Dennis concedes that the district court was "arguably correct" that his delusions did not negate the intent required for the murder of Doreen but claims the evidence would have helped negate malice as to the fetus and, accordingly, the jury would have acquitted Dennis of any charges as to the fetus. But Dennis's argument that the jury would have acquitted him of any charges as to the fetus was raised for the first time on appeal, and we may decline to consider it. *In re E.R. Fegert, Inc.*, 887 F.2d 955, 957 (9th Cir. 1989) ("The rule in this circuit is that appellate courts will not consider arguments that are not properly raised in the trial courts" (cleaned up) (quoting *Rothman v. Hosp. Serv. of S. Cal.*, 510 F.2d 956, 960 (9th Cir. 1975))).

And Dennis's original prejudice argument in the SAP—that he would have received voluntary manslaughter convictions for both Doreen and the fetus if Gonzales presented additional mental health evidence in the guilt phase—is foreclosed by the California Supreme Court's opinion on direct appeal. The California Supreme Court determined that there was no crime of voluntary manslaughter of a fetus in California. *See Dennis*, 950 P.2d at 1055. The California Supreme Court also held that the jury was improperly instructed on voluntary manslaughter with respect to Doreen because the killing could not have occurred in a sudden quarrel or heat of passion and the diminished capacity defense in California had been abolished before the crimes here. *Id*. at 1058. We are bound by the

34

California Supreme Court's determinations on matters of state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("[A] state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

But even considering Dennis's new prejudice argument raised for the first time on appeal—that the jury would have acquitted him of any charges as to the fetus—the claim fails. Dennis was convicted of a lesser offense with respect to the fetus, second-degree murder. Dennis cannot show that counsel was deficient in not presenting additional mental health evidence or that such presentation would have resulted in Dennis's acquittal on the fetus murder charge. Dennis used a machete to attack Doreen. It was so dangerous that Dennis seriously injured his own hand in the process of using it. Dennis had purchased plywood boxes appearing to be homemade coffins, and an anchor, to dispose at sea the murdered bodies of Doreen and her husband. The fetus autopsy report described many cuts to the fetus, including the amputation of its foot. Dennis told Dr. Benson that he continued cutting Doreen after the fetus was expelled. He did not call for help then, or ever. During deliberations, the jury asked to see a machete and requested a readback of Dr. Hauser's (the doctor who performed the autopsies on Doreen and the fetus) testimony about the fetus. The prosecutor argued in the guilt phase closing argument that the fetus "was not only a child, but . . . a symbol of Doreen, of Doreen's fertility,

35

of Doreen's ability to bear children, of the child that she bore [Dennis]." Even the most effective counsel could not have altered these facts. For these reasons, in addition to all the reasons identified above with respect to the issues related to mental health, this claim is not debatable among jurists of reason, and we deny a COA. *See Miller-El*, 537 U.S. at 336.

IV.   Trial counsel did not have a conflict of interest in representing Dennis.

Finally, Dennis alleged that Gonzales had a conflict of interest because he was burned out and internally conflicted, which subsequently led him to become a prosecutor and seek a judicial appointment. Dennis claims these internal conflicts made Gonzales a less effective advocate. The California Supreme Court denied this claim on the merits and dismissed it as untimely and successive. In the district court, the State raised procedural default as a defense, but the district court rejected the defense. In 2008, the district court granted summary judgment on this claim in favor of the State, reasoning that the claim did not allege that Gonzales was deficient "in any particular respect." The district court denied a COA. Again, we agree and decline to expand the COA to include this claim because Dennis does not show that reasonable jurists could disagree with the district court. On appeal, the State reasserts procedural default as an affirmative defense, and we again assume without deciding that Dennis can overcome the procedural default.

The right to effective assistance of counsel includes a "correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). To establish an actual conflict of interest, Dennis must show that his lawyer "actively represented conflicting interests," and the "actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980).

Dennis claims that Gonzales was "burned out, 'tired,' and planned to leave the defense community entirely at the time of [Dennis's] trial." Dennis also stresses that Gonzales described his case as an "emotional baptism."

As an initial matter, it is not a conflict of interest to be burned out or to plan to leave the public defense community. But even if it were, Gonzales's comments in requesting a continuance and opposing reassignment to a different public defender demonstrate his dedication to his client and his effective advocacy in obtaining a necessary continuance of the trial date:

> Oh, no, Your Honor. If I make a commitment to try the case, there have been a lot of things in my opinion that I have thought about. You know, I get tired, too. But I have made a commitment to myself and my client that I would not leave the homicide team until I finished all my present cases. And I feel that is something that I owe not only to my clients, but more importantly, to the office and to the court.
>
> So I will not—I will not get in—only way they'll keep me from trying the case, if I have some catostrophic [sic] illness or something. But I will be prepared to try it.

Furthermore, the correspondence between Gonzales and Dennis does not indicate any negative feelings between them. In any event, even if such feelings existed, they cannot serve as a basis for a conflict-of-interest claim. *See Plumlee v. Masto*, 512 F.3d 1204, 1210–11 (9th Cir. 2008) (holding that there is not a violation of the Sixth Amendment where "a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust"); *Perez Goitia v. United States*, 409 F.2d 524, 527 (1st Cir. 1969) (stating that a "lack of rapport between attorney and client does not automatically mean that there has been inadequate representation"). Because nothing in the record suggests that Gonzales "actively represented conflicting interests," *Cuyler*, 446 U.S. at 350, or otherwise had a conflict of interest, we deny Dennis's request for a COA.

## CONCLUSION

For these reasons, we affirm the district court's decision as to Dennis's certified claims, and we deny a COA as to his uncertified claims.

**AFFIRMED.**